No. 25-2001

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

JOE MANIS,

*Appellant*,

v.

U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS,
in her official capacity as the Secretary of Agriculture; MICHAEL WATSON,
in his official capacity as Administrator of the Animal
and Plant Health Inspection Service,

*Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:24-CV-00175-WO-JLW

---

**OPENING BRIEF OF APPELLANT**

---

JOSHUA M. ROBBINS
ALLISON D. DANIEL
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
(202) 945-9524
JRobbins@pacificlegal.org
ADaniel@ pacificlegal.org

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Appellant Joe Manis states that, consistent with his Disclosure Statement filed September 5, 2025 (Dkt. No. 6), he is an individual and no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...........................................................................v

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF ISSUES ...........................................................................3

INTRODUCTION .....................................................................................4

STATEMENT OF THE CASE........................................................................6

   I.  Tennessee Walking Horses and the HPA .................................................6

   II.  USDA's In-House Adjudication Process......................................................7

   III. Procedural History ..........................................................................9

SUMMARY OF THE ARGUMENT ....................................................................11

ARGUMENT ..........................................................................................15

   I.  Standard of Review..........................................................................15

   II.  Manis Is Entitled to a Jury Trial Under the Seventh Amendment .................16

      A. The HPA Claim Is Legal in Nature .......................................................19

         1. The HPA Claim Is a Common Law Action in Debt ...........................19

         2. The HPA Claim Is Also Closely Related to Other Common Law Claims........................................................................................21

            a. The HPA Claim Is Analogous to Common Law Fraud .................22

            b. The HPA Claim Is Analogous to Breach of Contract....................24

            c. The HPA Claim Is Analogous to Tortious Interference..................24

ii

B. The Public Rights Exception Does Not Apply to the HPA Claim ..........25

  1. The HPA Claim Does Not Fall into the Six Public Rights
     Categories ................................................................27

  2. *Atlas Roofing* Is a Narrow and Aberrant Application of the Public
     Rights Exception ........................................................27

  3. Because the HPA Claim Is Not Unknown to the Common Law,
     *Atlas Roofing* Does Not Apply ...........................................29

     a. The HPA Claim Is Dissimilar to *Atlas Roofing* .............................29

     b. The Nature of a Claim, Not Its Purpose, Determines the
        Applicability of the Public Rights Exception...................................31

     c. The District Court Misapplied *Jarkesy's* Common Law
        Analysis ................................................................32

III. USDA's In-House Adjudication Process Violates Article III .......................35

IV. The Judicial Officer Unconstitutionally Exercises Principal Officer
    Power ..............................................................................36

  A. The Judicial Officer Functions as a Principal Officer Without a Proper
     Appointment ............................................................38

  1. *Arthrex* Requires Principal Officer Review of Executive Branch
     Adjudicative Decisions........................................................38

  2. The Judicial Officer's Decisions Cannot Be Reviewed by a
     Principal Officer ..............................................................41

  3. Removability Is Ineffective Supervision Where It Provides No
     Means to Change a Decision Once Made .............................................45

  4. None of the Secretary's Other Supervisory Tools Replaces the
     Lack of Principal Officer Review.........................................47

  B. The Judicial Officer Does Not Hold an Office Created by Statute ..........48

V. This Court Should Order the Entry of a Permanent Injunction......................52

iii

CONCLUSION ....................................................................................54

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................................54

CERTIFICATE OF COMPLIANCE......................................................55

CERTIFICATE OF SERVICE ..............................................................56

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021)..........................................................................53

*AT&T, Inc. v. FCC*,
135 F.4th 230 (5th Cir. 2025) ...........................................................21

*Atlas Roofing Co., Inc. v. OSHRC*,
430 U.S. 442 (1977)...................................................................*passim*

*Auffmordt v. Hedden*,
137 U.S. 310 (1890)..........................................................................51

*Axalta Coating Sys. LLC v. FAA*,
144 F.4th 467 (3d Cir. 2025) ............................................................30

*Axon Enterprise, Inc. v. FTC*,
598 U.S. 175 (2023)...................................................................1–2, 53

*Ballard v. Comm'r*,
544 U.S. 40 (2005)............................................................................42

*Beal v. United States*,
182 F.2d 565 (6th Cir. 1950) ............................................................50

*Berman v. Riverside Casino Corp.*,
323 F.2d 977 (9th Cir. 1963) ............................................................23

*BFP v. Resol. Tr. Corp.*,
511 U.S. 531 (1994)..........................................................................22

*Burnap v. United States*,
252 U.S. 512 (1920)....................................................................36, 49

*Catts v. Phalen*,
43 U.S. 376 (1844)............................................................................23

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
    526 U.S. 687 (1999) ...................................................................... 30

*Collins v. Yellen*,
    594 U.S. 220 (2021) ........................................................................ 2

*Curtis v. Loether*,
    415 U.S. 189 (1974) ............................................................... 21, 30

*Dep't of Hous. & Urb. Dev. v. Rucker*,
    535 U.S. 125 (2002) ...................................................................... 32

*Drs. Co. v. Women's Healthcare Assocs., Inc.*,
    285 Va. 566 (2013) ....................................................................... 24

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ...................................................................... 52

*Edmond v. United States*,
    520 U.S. 651 (1997) .............................................................. *passim*

*Evaluation Rsch. Corp. v. Alequin*,
    439 S.E.2d 387 (Va. 1994) ............................................................ 22

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ...................................................................... 51

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................................ 38–39

*Garret v. Taylor* (1621),
    79 Eng. Rep. 485; Cro. Jac. 567 .................................................... 25

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) .................................................... 17, 22, 24, 35

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ...................................................................... 36

*Hannah v. Larche*,
    363 U.S. 420 (1960) ...................................................................... 45

*Harris v. Bowden* (1563),
    78 Eng.Rep. 348; Cro.Eliz. 90 .......................................................... 23

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) .......................................................................... 24

*Husky Int'l Elecs., Inc. v. Ritz*,
    578 U.S. 355 (2016) .......................................................................... 22

*Kennedy v. Braidwood Mgmt., Inc.*,
    145 S. Ct. 2427 (2025) ............................................................. *passim*

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ............................................................. 54

*Lucia v. SEC*,
    585 U.S. 237 (2018) .................................................................. 38, 48–50

*Manis v. USDA*,
    No. 24-1367, 2025 WL 2389422 (4th Cir. Aug. 21, 2025) ......................... 10, 53

*Manning v. Caldwell for City of Roanoke*,
    930 F.3d 264 (4th Cir. 2019) ........................................................... 19

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022) ........................................................... 53

*Morgan v. United States*,
    298 U.S. 468 (1936) ............................................................................ 8

*Murray's Lessee v. Hoboken Land & Imp. Co.*,
    59 U.S. 272 (1855) ............................................................................ 26

*Myers v. United States*,
    272 U.S. 52 (1926) ............................................................................ 50

*New Mexico v. Musk*,
    784 F. Supp. 3d 184 (D.D.C. 2025) ................................................. 49

*NFIB v. OSHA*,
    595 U.S. 109 (2022) .......................................................................... 44

*NFIB v. Sebelius,*
 567 U.S. 519 (2012)..................................................................31

*Parsons v. Bedford, Breedlove & Robeson,*
 28 U.S. 433 (1830)...................................................................25

*PBM Prods., LLC v. Mead Johnson & Co.,*
 639 F.3d 111 (4th Cir. 2011) ..................................................53

*In re: Philip Trimble,*
 77 Agric. Dec. 15 (U.S.D.A. June 8, 2018)..............................8

*Philpot v. Indep. J. Rev.,*
 92 F.4th 252 (4th Cir. 2024) ...................................................15

*Porter v. Clarke,*
 852 F.3d 358 (4th Cir. 2017) ..................................................15

*SEC v. Jarkesy,*
 603 U.S. 109 (2024)............................................................*passim*

*Sun Valley Orchards, LLC v. U.S. Dep't of Lab.,*
 148 F.4th 121 (3d Cir. 2025) ........................................24, 30, 35

*Tarleton v. M'Gawley* (1793),
 170 Eng. Rep. 153; Peake 270................................................25

*Tull v. United States,*
 481 U.S. 412 (1987)............................................................*passim*

*United States v. Arthrex,*
 594 U.S. 1 (2021)...............................................................*passim*

*United States v. Maurice,*
 26 F. Cas. 1211 (C.C.D. Va. 1823).........................................49

*Utica Packing, Co. v. Block,*
 781 F.2d 71 (6th Cir. 1986) ...............................................42, 45

*Waldrop v. S. Co. Servs.,*
 24 F.3d 152 (11th Cir. 1994) .............................................21, 33

*In re: World Wide Citrus*,
50 Agric. Dec. 319 (U.S.D.A. May 9, 1991)............................................8, 48, 52

**Constitutional Provisions**

U.S. Const. amend. VII.................................................................................12, 15

U.S. Const. art. II, § 2, cl. 2 ............................................................14, 37, 48, 50

U.S. Const. art. III, § 2, cl. 1 .....................................................................25

**Statutes**

5 U.S.C. § 702..............................................................................................53

5 U.S.C. § 3105.............................................................................................8

7 U.S.C. § 1762(a) ........................................................................................51

7 U.S.C. § 2204-2.................................................................................*passim*

7 U.S.C. § 2204-3.................................................................................*passim*

15 U.S.C. § 1821...........................................................................................1, 6

15 U.S.C. § 1821(3) ...................................................................................6–7

15 U.S.C. § 1822.........................................................................................34

15 U.S.C. § 1822(2) ...........................................................................6, 23, 32

15 U.S.C. § 1822(3) .......................................................................................31

15 U.S.C. § 1823(c) .......................................................................................7

15 U.S.C. § 1823(e) .......................................................................................7

15 U.S.C. § 1824.....................................................................................30–31

15 U.S.C. § 1824(2) ...................................................................................7, 31

15 U.S.C. § 1824(2)(D).................................................................................23

15 U.S.C. § 1825.........................................................................................34

15 U.S.C. § 1825(b) ...................................................................1, 7, 15, 18

15 U.S.C. § 1825(b)(1) ........................................................................20

15 U.S.C. § 1825(b)(4) ........................................................................48

15 U.S.C. § 1825(c) .............................................................................7

15 U.S.C. § 1825(d)(6) ..........................................................................1

28 U.S.C. § 1291 ..................................................................................2

28 U.S.C. § 1331 ..................................................................................1

29 U.S.C. § 651(b)(5) ..........................................................................28

29 U.S.C. § 654(a)(2) ...........................................................................28

**Other Authorities**

7 C.F.R. § 1.131 ............................................................................7–8, 47

7 C.F.R. § 1.132 ................................................................................44

7 C.F.R. § 1.133 .................................................................................8

7 C.F.R. § 1.139 .................................................................................8

7 C.F.R. § 1.142(c)(4) ..........................................................................8

7 C.F.R. § 1.144 .................................................................................7

7 C.F.R. § 1.145 ............................................................................7–8, 42

7 C.F.R. § 1.145(i) ....................................................................8. 41, 47–48

7 C.F.R. § 2.11 .................................................................................48

7 C.F.R. § 2.12 .................................................................................44

7 C.F.R. § 2.27 ..............................................................................7, 44

7 C.F.R. § 2.27(a)(1) ............................................................................8

7 C.F.R. § 2.35 ...................................................................7–9, 15, 37, 42, 50

x

7 C.F.R. § 2.35(a)(1) ................................................................41

9 C.F.R. § 11.1 ........................................................................47

9 C.F.R. § 11.20(a) ...................................................................7

9 C.F.R. § 11.20(b) ...................................................................7

9 C.F.R. § 11.25(f) ....................................................................7

10 Fed. Reg. 13,769 (Nov. 9, 1945) .............................9, 37, 50

18 Fed. Reg. 3219 (June 5, 1953) .............................................50

90 Fed. Reg. 22,607 (May 29, 2025) ..........................................7

Restatement (Second) of Contracts § 17 (1981) .......................24

Restatement (Second) of Torts § 766B (1979) ..........................24

Restatement (Second) of Torts § 912 (1979) .............................25

Smith, Jordan T., *Cheater's Justice: Judicial Recourse for Victims of Gaming Fraud*, 7 UNLV Gaming L.J. 61 (2017) ...............23

## JURISDICTIONAL STATEMENT

The district court and this Court have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Appellant Joe Manis's claims regard structural violations of the U.S. Constitution in connection with the U.S. Department of Agriculture's (USDA) internal adjudication process, in which Manis is defending himself against an alleged violation of the Horse Protection Act (HPA), 15 U.S.C. § 1821 *et seq*.; JA009–034. Jurisdiction is also proper under 15 U.S.C. § 1825(d)(6), which gives U.S. district courts jurisdiction over actions to enforce the HPA and "all other kinds of cases arising under the [HPA], except as provided in subsection (b) of this section." Manis is not presently seeking review of a violation and civil penalty assessment pursuant to § 1825(b). JA009–034.

Additionally, the district court and this Court have subject matter jurisdiction to review Manis's structural constitutional claims prior to the conclusion of USDA's adjudication process pursuant to *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023). *Axon* held that district courts had subject matter jurisdiction to hear collateral removal and due process claims against Federal Trade Commission and Securities and Exchange Commission (SEC) adjudications because (1) the harm from such claims could not be remedied after the fact, (2) they were collateral to the adjudications themselves, and (3) the agencies were not experts in resolving constitutional claims. *Id.* at 190–96.

This same reasoning applies to all four of Manis's claims. Manis's removal claim is squarely covered by *Axon*. *Id.* at 182–83. Manis's remaining three claims—that the USDA adjudication process violates the Appointments Clause, the Seventh Amendment, and Article III—also meet *Axon*'s requirements because they "challeng[e] the [USDA's] power to proceed at all" and the harm to Manis from the violations "is impossible to remedy once the proceeding is over." *Id.* at 191–92.

For the Appointments Clause claim, the improper appointment of an officer voids the actions he took. *See Collins v. Yellen*, 594 U.S. 220, 258 (2021). Thus, Manis's USDA adjudication could not proceed with an invalidly appointed final decision-maker. Additionally, the Seventh Amendment and Article III claims turn on whether USDA's HPA claim against Manis falls within the public rights exception such that it does not have to be adjudicated in an Article III court. *SEC v. Jarkesy*, 603 U.S. 109, 127–32 (2024). This, too, goes directly to the question of whether USDA has the power to adjudicate the HPA claim. *Axon*, 598 U.S. at 192.

The district court entered judgment dismissing Manis's claims on August 19, 2025. JA297. Manis filed his notice of appeal on August 25, 2025, which was timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B). JA298–300. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is from a final judgment of the U.S. District Court for the Middle District of North Carolina.

## STATEMENT OF ISSUES

I.   Whether the Seventh Amendment guarantees Manis a jury trial on USDA's HPA claim, which is a common law claim with civil money penalties.

II.  Whether Article III requires USDA's HPA claim, which is a common law claim with civil money penalties, to be heard in an Article III court.

III. Whether USDA's final adjudication decisionmaker—the Judicial Officer—is unconstitutionally exercising principal officer power without being appointed as a principal officer or holding a statutorily created office consistent with the Appointments Clause.

IV.  Whether this Court should order the district court to enter a permanent injunction.[1]

---

[1] Manis is not pursuing his removal claim (Count II) in this appeal.

3

## INTRODUCTION

For over two years, Joe Manis—an owner and presenter of Tennessee Walking Horses—has been defending himself against USDA's accusation that he violated the HPA. He has been forced to do this in USDA's internal adjudication process that operates outside the Constitution. Manis's USDA adjudication has been structured such that he was afforded neither the due process and jury trial protections of the independent Article III courts nor the political accountability protection that the Appointments Clause is supposed to provide for Executive Branch decision making. He brought this collateral lawsuit against USDA to stop USDA's unconstitutional process and end the ongoing harm it is causing him.

In the HPA, Congress established a prohibition on the entry into horse shows of horses that were mistreated, and it provided for serious fines and lengthy disqualifications from horse show participation for violators. The enforcement of civil money penalties for violations of the law has long been adjudicated in common law courts. Based on this history and the protections of Article III and the Seventh Amendment, Manis should have been able to defend himself before a jury in an Article III court.

Nevertheless, Congress solely granted authority to the Secretary of Agriculture to adjudicate liability and impose penalties for violations of the HPA. Worse still, Congress cut off the Secretary's political accountability for these

decisions. Congress permitted the Secretary to completely hand off responsibility for adjudicative decisions, and if she did, prohibited the Secretary from reviewing them. The Secretary took advantage of this and created a position to make the final decisions. This structure violates the Appointments Clause's requirement that properly created and appointed principal officers must make final, binding adjudicative decisions for the Executive Branch.

The district court rejected Manis's constitutional challenges to this arrangement. But in doing so, it highlighted just how far USDA's adjudication process has strayed from the Constitution. Instead of treating the Seventh Amendment and Article III as broad protections for private rights, it applied a restrictive test that allows Congress to freely evade their protections. And instead of enforcing the Appointments Clause, it cobbled together various USDA regulations to create the illusion that the Secretary retained control of USDA's adjudication process.

Manis is entitled to have USDA's HPA claim adjudicated in the manner that the Constitution requires. Because USDA's adjudication structure denies Manis a jury trial in an Article III court *and* a politically accountable decisionmaker within the Executive Branch, it is unconstitutional. As a result, Manis's USDA adjudication must be enjoined.

5

## STATEMENT OF THE CASE

### I.  Tennessee Walking Horses and the HPA

Manis is a retired North Carolina businessman who has spent decades involved in the Tennessee Walking Horse community. JA009. He has been an active member of the North Carolina Walking Horse Association ("NCWHA") for 30 years. JA009. He has many times served as president of the NCWHA and has served in virtually every position with that association at some time. JA012. In January 2024, Manis for the second time received the NCWHA's Senior Horse Person award, given to recognize participants who best epitomize sportsmanship, success, and contributions to the good of the walking horse breed. JA012.

There is a significant horse-showing industry built around the Tennessee Walking Horse. *See* JA011. The horses have three distinctive gaits—the flat-foot walk, running walk, and canter—and are shown in competitions across the southeast United States. JA011. Tennessee Walking Horse participants have sometimes engaged in the unfortunate practice of horse soring. JA012. Soring is the inflicting of pain on the legs of a horse through devices or chemicals to exaggerate the horse's gait for advantage in competitions. 15 U.S.C. §§ 1821(3), 1822(2).

In 1970, Congress passed the HPA in an effort to prohibit horse soring in competitive events. 15 U.S.C. § 1821 *et seq.* The HPA does not ban the practice of soring itself, but prohibits, among other things, the showing or exhibition of sore

horses. 15 U.S.C. § 1824(2). The HPA defines soring as the practice of applying "irritating or blistering agent[s]," inflicting "burn[s], cut[s], or laceration[s]," inserting "any tack, nail, screw, or chemical agent," or the use of "any other substance[s] or device[s]" on the limb of a horse that cause "or can reasonably be expected" to cause "physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving." 15 U.S.C. § 1821(3).

The HPA is enforced through inspections at horse shows conducted by licensed individuals appointed by the show's management and by USDA employees. 15 U.S.C. § 1823(c), (e). Horses found to be sore in the opinion of the inspector must be disqualified from the competition. 9 C.F.R. § 11.20(a), (b). And USDA can initiate civil enforcement proceedings to address disqualifications. *See* 9 C.F.R. § 11.25(f).

The Secretary can impose civil money penalties of up to $7,183 per violation and disqualify violators from the walking horse industry after notice and a hearing. 15 U.S.C. § 1825(b), (c); 90 Fed. Reg. 22,607, 22,610 (May 29, 2025). The Secretary directed that hearings on alleged violations of the HPA be conducted through USDA's in-house adjudication process and delegated her final decision-making authority to USDA's Judicial Officer. *See* 7 C.F.R. §§ 1.131, 1.144–45, 2.27, 2.35.

## II. USDA's In-House Adjudication Process

USDA operates an internal administrative hearing process to adjudicate its civil enforcement actions pursuant to several statutes, including the HPA. 7 C.F.R.

§§ 1.131, 1.133. Administrative law judges (ALJs) make the initial decision in each adjudication, 7 C.F.R. § 2.27(a)(1), and are appointed by the Secretary pursuant to 5 U.S.C. § 3105. *See, e.g.*, *In re: Philip Trimble*, 77 Agric. Dec. 15, 17 (U.S.D.A. June 8, 2018). Their initial decisions are only reviewed if appealed. 7 C.F.R. § 2.27(a)(1).

An ALJ's initial decision can be appealed only to USDA's Judicial Officer. 7 C.F.R. §§ 1.145, 2.35. The Judicial Officer hears appeals and issues a final decision for USDA. 7 C.F.R. § 1.145. Judicial Officer decisions are "final for purposes of judicial review." 7 C.F.R. §§ 1.139, 1.142(c)(4), 1.145(i).

The Judicial Officer position arose from *Morgan v. United States*, 298 U.S. 468, 481 (1936), which required the decisionmaker in an adjudicatory proceeding to conduct a "hearing in a substantial sense" before issuing a decision. But it was impossible for the Secretary to hear evidence and argument herself for all USDA "quasijudicial functions." *See In re: World Wide Citrus*, 50 Agric. Dec. 319, 335, 339 (U.S.D.A. May 9, 1991). So, Congress granted the Secretary the authority to delegate her final decision-making power to not more than two "officers or employees" of USDA. 7 U.S.C. § 2204-2. The Secretary's delegations of authority are "vested by law in the individual to whom the delegation is made, instead of in the Secretary" and any "revocation" cannot "be retroactive." 7 U.S.C. § 2204-3. Pursuant to § 2204-2, the Secretary created the position of Judicial Officer and delegated to him the Secretary's final decision-making authority in many USDA

adjudications, including civil enforcement of the HPA. 7 C.F.R. § 2.35; *see also, e.g.*, 10 Fed. Reg. 13,769 (Nov. 9, 1945).

## III. Procedural History

On May 19, 2023, the Animal and Plant Health Inspection Service (APHIS) filed a complaint against Manis initiating USDA's adjudication process (HPA Dkt. No. 23-J-0044) (USDA Adjudication). JA041. The complaint alleged Manis violated the HPA by allowing the entry into a Virginia horse show of a horse he owned while the horse was allegedly sore (HPA Claim). JA041. While APHIS alleges that the horse was sore, it does not allege that Manis sored the horse, caused the horse to become sore, or otherwise abused the horse. JA041–042. Manis denied the allegation. JA044–045.

Manis's hearing took place before an ALJ beginning on April 30, 2024. JA087. After *Jarkesy*, APHIS moved to reduce its recommended monetary penalty to $10 to avoid a Seventh Amendment claim. JA202–203. On February 3, 2025, the ALJ issued her initial decision finding Manis liable and imposing the requested $10 penalty as well as a one-year disqualification from participation in the walking horse industry. JA208–219. The disqualification is very broad, encompassing "any activity beyond that of a spectator," including "being present in the warmup or inspection areas" "and financing the participation of others in equine events." JA218. Manis appealed that decision to the Judicial Officer. JA221–222. The USDA Adjudication

9

was stayed by the Judicial Officer on Manis's motion until there is a final judgment in this collateral litigation. JA221–232.

On March 1, 2024, Manis filed a Complaint in federal district court seeking injunctive relief from his USDA Adjudication. JA009–034. He raised four claims: (1) USDA's Judicial Officer is making final decisions—a principal officer function—without a principal officer appointment or office, leaving USDA's ALJs improperly supervised; (2) USDA ALJs are unconstitutionally protected from removal by two layers of tenure protection; (3) the Seventh Amendment entitles Manis to a jury trial on the HPA Claim; and (4) Article III requires that the HPA Claim be heard in an Article III court. JA023–032. He moved for a temporary restraining order and preliminary injunction on March 6, 2024. JA035–039.

On April 24, 2024, after oral argument, the district court denied Manis's motion for a preliminary injunction. JA090–112. Manis appealed that decision. JA113–115. He also continued litigating in the district court with the parties briefing dispositive motions through August 2024. JA003–007 On August 18, 2025, this court affirmed the district court's denial of a preliminary injunction in an unpublished, per curium opinion that held Manis had not demonstrated irreparable injury. *Manis v. USDA*, No. 24-1367, 2025 WL 2389422 (4th Cir. Aug. 21, 2025).

The next day, August 19, 2025, the district court issued its order on the parties' cross-dispositive motions. JA233–296. It granted the Defendants' Motion to Dismiss

Pursuant to Fed. R. Civ. P. 12(b)(6), or in the Alternative, for Summary Judgment, denied Manis's Cross-Motion for Summary Judgment, and entered judgment dismissing all of Manis's claims. JA296. The district court held that the Judicial Officer was not appointed in violation of the Appointments Clause because 7 U.S.C. § 2204-2 authorized his office and he was adequately supervised by the Secretary through discretionary review of his decisions and at-will removal. JA247–278. The district court rejected Manis's dual-layer removal claim because the ALJ proceeding had concluded, and Manis did not allege additional harm beyond the removal-protected ALJ deciding his claim. JA278–286. Finally, the district court concluded that the HPA Claim's adjudication within USDA without a jury did not violate Article III and the Seventh Amendment because the claim was not legal in nature and thus fell within the public rights exception to Article III jurisdiction. JA286–294. On August 25, 2025, Manis noticed this appeal. JA298–300.

## SUMMARY OF THE ARGUMENT

Manis's USDA Adjudication is unconstitutional. Congress violated the Seventh Amendment and Article III of the Constitution when it assigned USDA's HPA Claim for civil money penalties—a legal claim—to USDA itself to adjudicate. Manis is entitled to a jury trial in an Article III court. But even if this Court disagrees, USDA's final adjudicative decision-maker—the Judicial Officer—issues his decisions in violation of the Appointments Clause. Final adjudicative decisions for

11

the Executive Branch must be made by a principal officer properly appointed to a statutorily created office. But neither of these conditions is true for the Judicial Officer.

The Seventh Amendment guarantees the right to a jury trial in all "suits at common law" over twenty dollars. U.S. Const. amend. VII. That includes statutory claims that are effectively common law claims. Two conditions must be met for the Seventh Amendment to apply: (1) the claim must be legal in nature and (2) it must not fall within the public rights exception to Article III jurisdiction. This second factor also determines whether a claim must be adjudicated in an Article III court.

*SEC v. Jarkesy*, 603 U.S. 109 (2024), provides the current rubric for applying the Seventh Amendment's two-part test to claims for civil money penalties. First, whether a claim is legal in nature is "effectively decide[d]" by the availability of punitive civil money penalties. *Id.* at 125. Analogies between the statutory claim and common law causes of action confirm that conclusion. And once the common law nature of a statutory claim is established, a presumption that it must be adjudicated in an Article III court attaches.

Second, the only way to overcome this presumption is if the statutory claim otherwise falls into the narrow public rights exception. Article III requires that all common law claims be adjudicated in an Article III court; there is no exception in the text. But the Supreme Court has recognized a handful of exceptions for matters

12

that were traditionally handled by the political branches. Unless a claim falls into one of those categories or is similar to the highly technical regulatory claims recognized as public rights in *Atlas Roofing Co., Inc. v. OSHRC*, 430 U.S. 442 (1977), it must be adjudicated in an Article III court.

Because the HPA Claim includes a civil money penalty remedy, it is common law in nature. Civil money penalty claims have long been recognized as common law claims. And the close relationship of the HPA Claim to common law fraud, breach of contract, and tortious interference confirms this conclusion. Thus, the Seventh Amendment presumptively requires that the HPA Claim be heard in an Article III court with a jury.

Because the HPA Claim is a common law claim, it does not fall within the public rights exception. It fits into none of the six historically recognized categories of public rights: revenue collection, tariffs, immigration, public lands, Indian–tribal relations, and public benefits. It also bears no resemblance to the highly technical regulatory claims in *Atlas Roofing*. The Seventh Amendment and Article III require that the HPA Claim be adjudicated in an Article III court with a jury.

If the Court concludes that the HPA Claim can be assigned away from an Article III court, the structure of USDA's adjudication process still violates the Appointments Clause. USDA's Judicial Officer has the authority to issue a final decision in the USDA Adjudication and impose significant penalties on Manis

13

without any review by the Secretary. Indeed, the Secretary is statutorily and constitutionally prohibited from intervening in the USDA Adjudication. Given this unreviewable adjudication authority, the Judicial Officer functions as a principal officer. *United States v. Arthrex*, 594 U.S. 1, 23 (2021). But the Judicial Officer unconstitutionally exercises this authority because his appointment by the Secretary was inconsistent with his principal officer function. Even assuming the Judicial Officer is an inferior officer, the Judicial Officer still cannot exercise any officer-level authority because he does not hold an office "established by Law" (i.e., created by statute) nor was appointment authority "vest[ed]" in the Secretary. U.S. Const. art. II, § 2, cl. 2.

Because the USDA adjudication process is unconstitutional, Manis's adjudication should be permanently enjoined. He is irreparably injured by being subjected to an unconstitutionally structured adjudication process. That injury cannot be remedied at all after the fact. Additionally, an injunction will not harm third parties but is in the public interest because USDA has no interest in pursuing an unconstitutional process for enforcing the HPA.

## ARGUMENT

### I. Standard of Review

The district court granted Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), or in the Alternative, for Summary Judgment construed as a motion

for summary judgment. JA295. The grant of summary judgment is reviewed de novo. *Philpot v. Indep. J. Rev.*, 92 F.4th 252, 257 (4th Cir. 2024).

## II. Manis Is Entitled to a Jury Trial Under the Seventh Amendment

The Seventh Amendment requires that USDA's allegation against Manis be tried before a jury in an Article III court. *Jarkesy*, 603 U.S. 109. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."[2] U.S. Const. amend. VII. The term "common law" in the Seventh Amendment "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Jarkesy*, 603 U.S. at 122 (internal quotation marks omitted). Whether the Seventh Amendment applies to a claim turns on two factors. First, the claim must be "legal in nature," taking into account "the cause of action and the remedy it provides." *Jarkesy*, 603 U.S. at 122–23. Second, the claim must not fall within the "'public rights' exception to Article III jurisdiction." *Id.* at 120.

*Jarkesy* is the Supreme Court's latest application of this test to statutory claims for civil money penalties. First, when evaluating the nature of the claim, *Jarkesy*

---

[2] The ALJ's decision to impose a penalty of only $10 does not affect Manis's Seventh Amendment claim. JA218. The Judicial Officer retains the authority to impose the full penalty on Manis pursuant to the Secretary's delegation. 15 U.S.C. § 1825(b); 7 C.F.R. § 2.35. Regardless, Manis's Seventh Amendment claim is not moot because USDA "'retains the authority and capacity'" to administratively adjudicate civil penalties in HPA cases. *Porter v. Clarke*, 852 F.3d 358, 364–65 (4th Cir. 2017).

considered the remedy to be the "'more important' consideration" than the cause of action. *Id.* at 123. For the securities fraud civil money penalties at issue in *Jarkesy*, the Court concluded that this remedy "[was] all but dispositive" that the Seventh Amendment applied. *Id.* at 123. "[O]nly courts of law issued monetary penalties to 'punish culpable individuals.'" *Id.* (citation omitted) The securities fraud civil money penalties were "designed to punish," and this "effectively decide[d]" that a jury trial was required. *Id.* at 125.

The Court then "confirm[ed]" this conclusion by evaluating the "close relationship" securities fraud had to common law fraud. *Id.* at 122–26. Securities fraud was not "identical" to common law fraud; it was both "narrower" and "broader." *Id.* at 126. Nevertheless, the statutory and common law claims were closely related because they "target[ed] the same basic conduct," "confirm[ing] that" securities fraud was "legal in nature." *Id.* at 125–26 (citation omitted).

Second, *Jarkesy* evaluated whether securities fraud fell within the narrow public rights exception. Because the Court already established that securities fraud was common law in nature, it began with the presumption that "adjudication by an Article III court is mandatory." *Id.* at 128. This was consistent with the Court's longstanding view that Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." *Id.* at 132 (citation and internal quotation marks omitted).

16

But the Court also recognized a limited exception for cases involving "matters [that] 'historically could have been determined exclusively by [the executive and legislative] branches'" (i.e., public rights). *Id.* (citation and internal quotation marks omitted). The exception is not found in the text of Article III, therefore, any application must be based on history and "background legal principles." *Id.* at 131. *Jarkesy* identified only six categories of cases that fit these criteria: revenue collection, immigration, tariffs, public lands, Indian–tribal relations, and public benefits. *Id.* at 129–30. Indeed, the exception is so narrow that even for "matters that arguably fall within the public rights doctrine, the presumption is in favor of Article III courts." *Id.* at 132 (internal quotation marks omitted).

*Jarkesy* was an easy case because the Court already held that statutory fraud claims were entitled to a jury trial in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). 603 U.S. at 134. Securities fraud did not fall into any of the six established public rights categories. Nor did the court consider it similar to *Atlas Roofing*'s highly technical regulatory claims. *Id.* at 137–38. "Even when an action like securities fraud 'originate[s] in a newly fashioned regulatory scheme,' what matters is the substance." *Id.* at 134 (citation omitted). Thus, statutory securities fraud claims required a jury trial in an Article III court. *Id.* at 140.

Applying *Jarkesy* here, Manis must receive a jury trial in an Article III court on the HPA Claim. The HPA Claim has a punitive civil money penalty remedy,

17

establishing its legal nature. 15 U.S.C. § 1825(b); *Jarkesy*, 603 U.S. at 122–25. Confirming that legal nature is its close relationship with common law fraud, breach of contract, and tortious interference. *Jarkesy*, 603 U.S. at 125–26. Therefore, the Seventh Amendment applies to the HPA Claim and it presumptively must be heard in an Article III court. *Id.* at 128. The narrow public rights cases do not displace that presumption. The HPA Claim fits within none of the six public rights categories. *Id.* at 128–30. And its common law nature and relationship to other common law claims distinguish it from *Atlas Roofing*. *Id.* at 136–40. Thus, the HPA Claim must be adjudicated in an Article III court with a jury. *Id.* at 132.

The district court reached the opposite conclusion because it inverted *Jarkesy*. Instead of analyzing whether the HPA Claim was legal in nature, it "assum[ed] the Seventh Amendment applie[d] to the HPA [Claim]" and proceeded directly to the public rights exception. JA290. Because it skipped the first step, it did not apply *Jarkesy*'s presumption in favor of Article III courts. 603 U.S. at 132. Instead, it treated *Atlas Roofing* as a public rights exception catchall and imposed strict requirements for concluding that a statutory claim is common law in nature. JA286–294. This Court should reject the district court's approach and apply both parts of

18

*Jarkesy*'s Seventh Amendment test to the HPA Claim in the manner the Supreme Court prescribed. [3]

## A. The HPA Claim Is Legal in Nature

The HPA Claim is legal in nature because it is a claim for civil money penalties. *Tull v. United States*, 481 U.S. 412, 418–25 (1987). This punitive legal remedy is "all but dispositive" that the Seventh Amendment applies. *Jarkesy*, 603 U.S. at 123. The civil money penalty also doubles as the common law cause of action—an action in debt. *Tull*, 481 U.S. at 418–21. Additionally, the HPA claim is analogous to common law fraud, breach of contract, and tortious interference, confirming its common law nature. *Jarkesy*, 603 U.S. at 125. Thus, the right to a jury trial in an Article III court presumptively attaches to the HPA claim. *Id.* at 128.

### 1. The HPA Claim Is a Common Law Action in Debt

The HPA Claim's legal remedy of civil money penalties "effectively decides" that Manis is "entitled to a jury." *Id.* at 125. Civil money penalties were traditionally imposed by courts of law. *Id.* at 123. And as in *Jarkesy*, the HPA's civil money

---

[3] This Court should consider the full Seventh Amendment inquiry in this appeal despite the district court failing to do so for two reasons. (1) The district court analyzed whether the HPA Claim was common law in nature, so it effectively conducted the full Seventh Amendment analysis. (2) This court has the discretion to resolve questions in the first instance without remand, *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 271 (4th Cir. 2019).

penalties' legal nature is confirmed by their "design[] to punish or deter the wrongdoer." *Id.*

The punitive nature of civil money penalties is determined by evaluating the statutory factors governing their imposition. *Id.* at 123–24. For HPA civil money penalties, the Secretary must consider "the nature, circumstances, extent, and gravity of the prohibited conduct" as well as "the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 1825(b)(1). Because these statutory factors are "designed to be punitive," the HPA's civil money penalties are common law in nature. *Jarkesy*, 603 U.S. at 123–24.

A claim for punitive civil money penalties is also a common law cause of action. *Id.* at 123. "Actions by the Government to recover civil penalties under statutory provisions [] historically have been viewed as one type of action in debt requiring trial by jury." *Tull*, 481 U.S. at 418–19. In *Tull*, the government's claim for $22 million in civil penalties for violations of the Clean Water Act was "clearly analogous to the 18th-century action in debt." *Id.* at 420. Thus, like the statutes in *Tull* and *Jarkesy*, the HPA Claim is a common law action in debt. *See id.*

20

## 2. The HPA Claim Is Also Closely Related to Other Common Law Claims

Further analysis of the HPA claim is not necessary to establish that it is a suit at common law. *See Tull*, 481 U.S. at 418; *Jarkesy*, 603 U.S. at 125. But like in *Jarkesy*, "[t]he close relationship" of the HPA Claim to other common law claims "confirms" that the Seventh Amendment applies. *Id.*

Establishing the legal nature of a statutory cause of action does not require "an 'abstruse historical' search" for a "precise[]" analog. *Tull*, 481 U.S. at 421. It suffices if the statutory and common law claims are broadly comparable. *See id.* For example, statutory housing discrimination claims were legal in nature because they were broadly analogous to various torts, including defamation, intentional infliction of emotional distress, and dignitary torts. *Curtis v. Loether*, 415 U.S. 189, 195 & n.10 (1974). In *Jarkesy*, statutory securities fraud was both "narrower" and "broader" than common law fraud, but still closely related for purposes of the Seventh Amendment. 603 U.S. at 126. Moreover, the common law cause of action need not "persuasively militate for a jury trial" where the remedy is definitively legal. *Waldrop v. S. Co. Servs.*, 24 F.3d 152, 156 (11th Cir. 1994); *see also AT&T, Inc. v. FCC*, 135 F.4th 230, 238 (5th Cir. 2025).

21

### a. The HPA Claim Is Analogous to Common Law Fraud

Applying this approach, the HPA Claim has a close relationship with common law fraud. The HPA claim "target[s] the same basic conduct" as common law fraud: "misrepresenting or concealing material facts." *Jarkesy*, 603 U.S. at 125. Traditional common law fraud requires "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994). But that is not the extent of the types of common law fraud claims the Supreme Court has recognized.

There are forms of fraud that do not require a false representation, which, in fact, "has never been a required element of 'actual fraud.'" *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 362 (2016). For example, common law fraud extends to fraudulent conveyance claims—claims in which the fraud is not committed through a false representation but "in the acts of concealment and hindrance." *Id.* Fraudulent conveyance "typically involve[s]" a transfer of assets by a debtor in circumstances that indicate the transfer was to hide the assets from a creditor (i.e., inadequate consideration). *Id.* at 361. The circumstances establish the fraud. *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 540–41 (1994). And the Court has also already recognized that statutory fraudulent conveyance cases require jury trials. *Granfinanciera*, 492 U.S. at 49, 56.

22

Here, USDA alleged that Manis violated a statute enacted to prevent sore horses from "compete[ing] unfairly with horses which are not sore." 15 U.S.C. § 1822(2). Horses that compete unfairly (i.e., cheat) harm the other competitors and the competition itself. *See id.* The HPA Claim endeavors to prevent this unfairness in competition by creating liability for effective misrepresentations or concealments of the sore nature of the horse at the time of entry. *See* 15 U.S.C. §§ 1822(2), 1824(2)(D); JA041. This is analogous to a fraudulent conveyance claim: Presenting a horse for entry that is sore, like transferring assets for inadequate consideration, is a circumstance sufficient for a finding of liability for fraudulent conduct. *See Jarkesy*, 603 U.S. at 132–33.

Indeed, cheating allegations in games have long been litigated through common law claims. As early as 1563, common law courts were hearing claims for money damages arising from cheating during gambling games. *See Harris v. Bowden* (1563) 78 Eng. Rep. 348, 348; Cro. Eliz. 90, 90 ("An action on the case will lie for playing with false dice."). Such fraud suits carried over into American law. *See, e.g.*, *Catts v. Phalen*, 43 U.S. 376, 381 (1844); *Berman v. Riverside Casino Corp.*, 323 F.2d 977, 979 (9th Cir. 1963); Jordan T. Smith, *Cheater's Justice: Judicial Recourse for Victims of Gaming Fraud*, 7 UNLV Gaming L.J. 61, 70–75 & n.117 (2017) (collecting cases).

23

### b. The HPA Claim Is Analogous to Breach of Contract

The HPA Claim is also closely related to breach of contract because it effectively alleges the violation of an agreement to abide by the horse show's rules. When the horse was entered, Manis agreed to abide by the show's applicable rules and regulations. JA128. That agreement is contractual in nature. *See* Restatement (Second) of Contracts § 17 (A.L.I. 1981); *Drs. Co. v. Women's Healthcare Assocs., Inc.*, 285 Va. 566, 575 (2013) (elements of breach of contract). And like all contracts, it incorporates "the laws which subsist[ed] at the time and place of" of its execution, including the HPA. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429–30 (1934) (internal quotation marks omitted). Thus, the HPA claim is an alleged violation of this implicit agreement. And "state-law causes of action for breach of contract ... are paradigmatic private rights" for which litigants are entitled to a jury trial. *Granfinanciera*, 492 U.S. at 56; *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F.4th 121, 128–29 (3d Cir. 2025).

### c. The HPA Claim Is Analogous to Tortious Interference

The HPA Claim also parallels tortious interference, a tort involving improper intentional disruption of a reasonable economic expectancy. *See* Restatement (Second) of Torts § 766B (A.L.I. 1979). By allegedly allowing the entry of a sore horse in a walking horse competition, Manis is accused of conduct that could have intentionally disrupted competitors' reasonable economic expectancies of fair

24

competition rewards and undermined the show's integrity. *See id.* § 912 cmt. f, illus. 16. This type of interference claim has deep common-law roots. *See, e.g.*, *Garret v. Taylor* (1621), 79 Eng. Rep. 485, 485; Cro. Jac. 567, 567 (threatened violence against workers and customers of quarry, deterring stone extraction and sales); *Tarleton v. M'Gawley* (1793), Eng. Rep. 153, 153; Peake 270, 270 (traders scared off from plaintiff's ship by defendant's cannon fire at traders' canoe).

### B. The Public Rights Exception Does Not Apply to the HPA Claim

Because the HPA claim is a common law claim for civil money penalties, it does not fall within the public rights exception. *See supra* Part II.A. Thus, Manis is entitled to a jury trial in an Article III court. *Jarkesy*, 603 U.S. at 127–41.

The public rights exception is truly an *exception* to Article III jurisdiction and not the default mode for statutory claims. *Jarkesy*, 603 U.S. at 132. The Article III judicial power "extend[s] to *all* Cases, in Law and Equity." U.S. Const. art. III, § 2, cl. 1 (emphasis added). The cases at "Law" covered by Article III are coextensive with cases at "common law" covered by the Seventh Amendment. *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 447 (1830). Such common law suits cannot be removed from Article III jurisdiction by Congress. *Jarkesy*, 603 U.S. at 127.

Therefore, the public rights exception is limited to "matters [that] 'historically could have been determined exclusively by [the executive and legislative]

branches.'" *Id.* at 128. This exception to Article III is entirely atextual and in each case "must [] derive [] from background legal principles" and history. *Id.* at 131. For example, in *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. 272 (1855), the Court "took pains to justify" the exception "by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign." *Jarkesy*, 603 U.S. at 131. Only six categories of public rights have been historically recognized. *Id.* at 128–30. The only other potential avenue to apply the public rights exception is for a claim to be similar to the highly technical regulatory claims that the Court allowed to be administratively adjudicated in *Atlas Roofing*. 430 U.S. at 461. Yet, even "matters that arguably fall within the scope of the 'public rights' doctrine" still enjoy a "presumption [] in favor of Article III courts." *Id.* at 132 (citation omitted).

The district court flipped this presumption around. It effectively required Manis to overcome a presumption that the HPA Claim *was* a public right. JA286– 294. To accomplish this, it reinterpreted *Jarkesy* to set a floor for establishing similarities between statutory and common law claims. JA291–292. That is not the law. The presumption in favor of Article III jurisdiction strongly favors Manis here because the HPA Claim is common law in nature and is *dissimilar* to the technical claims in *Atlas Roofing*. *Jarkesy*, 603 U.S. at 132–40.

### 1. The HPA Claim Does Not Fall into the Six Public Rights Categories

*Jarkesy* acknowledged six historically recognized categories of public rights that could be adjudicated outside an Article III court: revenue collection, immigration, tariffs, public lands, Indian–tribal relations, and public benefits. 603 U.S. at 128–32. The HPA Claim regarding the entry of horses into horse shows fits none of these categories. The district court agreed. JA290. That leaves only *Atlas Roofing* as the basis for invoking the public rights exception. But the district court wrongly used *Atlas Roofing* to deprive Manis of his Seventh Amendment right that extends to the HPA Claim even though it "originate[s] in a newly fashioned regulatory scheme." *Jarkesy*, 603 U.S. at 134 (internal quotation marks omitted).

### 2. *Atlas Roofing* Is a Narrow and Aberrant Application of the Public Rights Exception

*Atlas Roofing* held that the Seventh Amendment permitted the Occupational Safety and Health Review Commission (an Executive Branch agency) to adjudicate civil money penalty claims for violations of workplace safety regulations established under the Occupational Safety and Health Act (OSH Act). 430 U.S. at 445–47. The OSH Act established a unique scheme in which the Occupational Safety and Health Administration (OSHA) was authorized to develop a detailed workplace safety code by regulation. *Jarkesy*, 603 U.S. at 136–37. Those administratively created standards were backed by civil money penalties for violations. *Id.* The Seventh Amendment

did not apply to such claims because they were "unknown to the common law." *Atlas Roofing*, 430 U.S. at 461.

But *Atlas Roofing* does not stand for the proposition that Congress can assign any new statutory cause of action with civil money penalties it creates to administrative adjudication without violating the Seventh Amendment. The Supreme Court "clarified in *Tull*" and reaffirmed in *Jarkesy* "that the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims." *Jarkesy*, 603 U.S. at 139.

After *Jarkesy*, *Atlas Roofing* applies only to the highly technical regulatory claims it considered under the OSH Act. *Id.* at 136–37. The OSH Act did not lay out safety standards in the statute; it simply commanded that "[e]ach employer ... shall comply with occupational safety and health standards promulgated under this chapter." *Id.* (quoting 29 U.S.C. § 654(a)(2) (1976 ed.)). The establishment of the substantive standards was left to OSHA. It resulted in standards that "resembled a detailed building code" rather than any common law claim. *Id.* at 137. This scheme was "self-consciously novel" and required the agency to "develop[] innovating methods, techniques, and approaches." *Id.* (quoting 29 U.S.C. § 651(b)(5) (1976 ed.)) (internal quotation marks omitted). This is the only reading of *Atlas Roofing* consistent with the Supreme Court's presumption in favor of Article III adjudication even for claims that arguably implicate public rights. *Jarkesy*, 603 U.S. at 132.

28

### 3. Because the HPA Claim Is Not Unknown to the Common Law, *Atlas Roofing* Does Not Apply

Given all of the common law features of the HPA Claim and the presumption in favor of Article III adjudication, the HPA Claim cannot fall into the public rights exception. *Id.* at 127–35. The HPA Claim is nothing like the highly technical OSHA claims created by regulation that were at issue in *Atlas Roofing*. *Id.* at 136–39. Nevertheless, the district court wrongly searched for reasons to distinguish the HPA Claim from its common law analogues. It selectively relied on the purpose of the HPA instead of on the nature of the HPA Claim itself. JA292–294. And it misapplied the common law analysis in *Jarkesy* by using it as the floor for a sufficiently close relationship between statutory and common law claims. JA291–292 There is no basis to displace the presumption in favor of Article III adjudication here, and so the Seventh Amendment applies to the HPA Claim.[4]

### a. The HPA Claim Is Dissimilar to *Atlas Roofing*

The HPA Claim bears no resemblance to the OSH Act claims that were "unknown to the common law" in *Atlas Roofing*. *See supra* Part II.A. The HPA neither establishes a self-consciously novel regulatory scheme nor defines the

---

[4] Even if the court concludes *Atlas Roofing* applies, Manis expressly preserves the argument that it should be overruled. Statutory claims for punitive civil money penalties are common law actions in debt that must be adjudicated in an Article III court with a jury as guaranteed by the Seventh Amendment. *Tull*, 481 U.S. at 417–25.

prohibited conduct through highly technical regulations. *Jarkesy*, 603 U.S. at 137. Instead, it simply prohibits cheating in horse shows by directly banning the entry of sore horses into horse shows. 15 U.S.C. § 1824. This is much more like statutory claims banning housing discrimination or a tort remedy for violations of constitutional rights by state officers to which the Seventh Amendment applies than *Atlas Roofing*. *Curtis*, 415 U.S. at 195; *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999).

The district court relied on the Third Circuit's decision in *Axalta Coating Sys. LLC v. FAA*, 144 F.4th 467 (3d Cir. 2025) to support its conclusion that the HPA Claim is covered by *Atlas Roofing*. JA288–290. But *Axalta* involved civil money penalties for violations of detailed technical regulations governing the transportation and labeling of hazardous materials that were directly analogous to *Atlas Roofing*. 144 F.4th at 476–77. In *Sun Valley Orchards*, the Third Circuit held that labor enforcement claims based in a "work contract" did *not* fall within the public rights exception because they were common law in nature. 148 F.4th at 128–29. *Sun Valley Orchard* distinguished the contract-like claim from the "'technical' hazardous materials regulations" at issue in *Axalta*. *Id.* at 128 n.4. *Sun Valley Orchards* is the approach this court should take to the common law HPA Claim. *See supra* Part II.A.

### b. The Nature of a Claim, Not Its Purpose, Determines the Applicability of the Public Rights Exception

The district court selectively relied on Congress's finding that horse soring is "'cruel and inhumane'" to conclude that the HPA Claim is an animal cruelty claim, which did not exist at common law. JA292–294. But Congress's purpose in enacting the HPA cannot substitute for the required analysis of the "substance of th[is] action." *See Jarkesy*, 603 U.S. at 122–23, 134. Here, Congress simply prohibited the entry of horses that are sore into horse shows. 15 U.S.C. § 1824(2). It is this specific claim that must be analyzed.

In fact, nowhere in the HPA is horse soring itself prohibited. The omission of a horse soring prohibition is no accident. The Commerce Clause would not permit Congress to reach such exclusively intrastate conduct as animal cruelty. *See NFIB v. Sebelius*, 567 U.S. 519, 536 (2012). That is why the prohibited conduct is based around horse shows, exhibits, sales, and auctions. 15 U.S.C. § 1824. It is also why Congress made a finding that the "showing, exhibition, or sale of sore horses in intrastate commerce adversely affects and burdens interstate and foreign commerce." *Id.* § 1822(3). To focus on the HPA Claim's purpose over its substance ignores the actual choice Congress made. This also allows the court to decline to enforce the Seventh Amendment whenever Congress creates a new statutory scheme

that has an overall purpose not addressed at common law regardless of its substance, an approach that *Jarkesy* flatly rejected. 603 U.S. at 139–40.

The district court also dismissed Congress's other finding that sore horses "compete unfairly with horses which are not sore" based on legislative history. 15 U.S.C. § 1822(2); JA292. But "reference to legislative history is inappropriate when the text of the statute is unambiguous." *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002). Moreover, where a statutory claim can be analogized to both legal (fraud) and non-legal (animal cruelty) claims, the claim is still legal in nature for purposes of applying the Seventh Amendment. *Tull*, 481 U.S. at 420–21.

### c.  The District Court Misapplied *Jarkesy*'s Common Law Analysis

Finally, the district court went to extensive lengths to distinguish the HPA Claim from common law fraud and breach of contract. JA291–294. The district court identified three ways that the HPA Claim was purportedly distinct from common law fraud: (1) a lack of citations to the invocation of common law fraud principles in HPA adjudications, (2) the absence of "common law fraud terms of art" in the HPA, and (3) the lack of a scienter and third-party harm requirements. JA292. It also distinguished common law breach of contract because of the lack of a third-party harm requirement and because a breach of contract "is collateral to the harm the HPA seeks to address." JA293.

32

But these distinctions do not sever the tie between the HPA Claim and the common law claims because such a conclusion would directly conflict with *Jarkesy*'s presumption that Article III adjudication is "mandatory." 603 U.S. at 128. If claims that "arguably fall within the scope of the public rights doctrine" are presumed to require Article III adjudication, courts cannot seek out reasons to assign a claim away from Article III adjudication. *Jarkesy*, 603 U.S. at 132 (internal quotation marks omitted).

With respect to common law fraud, the use of fraud principles in HPA cases and common law terms of art cannot be necessary to conclude the claims are analogous because such a tight screen for legal claims would displace the remedy as the "'more important' consideration." *Jarkesy*, 603 U.S. at 123. In *Jarkesy*, it was the common law remedy that was "all but dispositive." *Id. Jarkesy* merely "confirm[ed]" its conclusion that the Seventh Amendment applied through the "close relationship" between securities fraud and common law fraud. *Jarkesy*, 603 U.S. at 125. And, as the Eleventh Circuit has long recognized, the analogy between the statutory and common law claims need not be particularly "persuasive[]" where the remedy is plainly common law in nature. *Waldrop*, 24 F.3d at 156; *accord Jarkesy*, 603 U.S. at 123.

The district court also objected that the HPA Claim lacked scienter and third-party harm requirements. JA292–294. The HPA Claim is indeed not identical to

33

common law fraud. But *Jarkesy* confirmed that need not be the case. 603 U.S. at 126. A statutory claim's scope, burden of proof, and elements can differ from the proposed common law analogue and *still* establish a "close relationship." *Jarkesy*, 603 U.S. at 126. In *Jarkesy*, statutory securities fraud differed in several important ways from common law fraud: it did not cover every securities fraud at common law and it had a lower "burden of proof" than common law fraud. *Id.*

Most notably, statutory securities fraud did *not* require a "showing of harm." *Id.* Indeed, the district court directly contradicted *Jarkesy* by using the lack of a third-party harm requirement to deny Manis a jury trial in an Article III court. JA293–294. Moreover, while the HPA Claim also does not strictly require proof of harm to third parties, 15 U.S.C. § 1825, it nevertheless addresses third-party harm because Congress created the HPA to address the competitive unfairness of sore horses. *Id.* § 1822. Finally, the HPA does not lack the scienter requirement of common law fraud as the district court claimed because it is analogous to a species of common law fraud—fraudulent conveyance—that can be established through circumstances rather than intent. *See supra* Part II.A.2.a; JA292.

The district court also rejected the analogy to common law breach of contract because "any potential breach of contract" was "collateral" to the "harm that the HPA seeks to address": the horse being sore. JA293. But the HPA Claim did not prohibit horse soring; it prohibited the entry of a sore horse into a horse show, which

34

is much more like a breach of contract claim. *See supra* Part II.A.2.b. Moreover, any breach of contract is technically collateral to the action that was or was not undertaken, leading to the breach. For example, the Third Circuit held that a Department of Labor claim that an employer did not provide H2-A visa employees with proper working conditions was analogous to a common law breach of contract claim because those conditions were "formalized" in a "job order" with the employee. *Sun Valley Orchards*, 148 F.4th at 128 (internal quotation marks omitted). Finally, the lack of a third party harm requirement is also not a basis to distinguish breach of contract because that was specifically not required in *Jarkesy*. 603 U.S. at 126.

## III.   USDA's In-House Adjudication Process Violates Article III

The HPA Claim must be adjudicated in an Article III court regardless of whether the Seventh Amendment applies. The second factor of the Seventh Amendment analysis, the public rights exception, determines whether Congress may "prevent[] the case from being heard before an Article III tribunal." *Jarkesy*, 603 U.S. at 127. Where a "statutory cause of action is legal in nature," the Seventh Amendment and Article III analyses "require[] the same answer." *Granfinanciera*, 492 U.S. at 53. Because the HPA Claim is common law in nature and falls outside the public rights exception, it must be adjudicated in an Article III court. *See Jarkesy*, 603 U.S. at 127–40; *see supra* Part II.

35

Additionally, Article III jurisdiction also extends to cases in equity, and Congress also may not withdraw equitable matters from the "judicial cognizance." *Jarkesy*, 603 U.S. at 132 (citation and internal quotation marks omitted). The HPA Claim's disqualification remedy is an injunction, which "is inherently an equitable remedy." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002). For this reason as well, the HPA Claim requires Article III adjudication. *See Jarkesy*, 603 U.S. at 132.

## IV.    The Judicial Officer Unconstitutionally Exercises Principal Officer Power

Even if the HPA claim can be assigned to the Executive Branch for adjudication, USDA's adjudication process is unconstitutionally structured. Final decisions in USDA adjudications are being made by USDA's Judicial Officer who is unconstitutionally appointed and who does not hold a statutorily created office. *Arthrex*, 594 U.S. at 23; *Burnap v. United States*, 252 U.S. 512, 517 (1920). If Manis is not entitled to a neutral judicial forum and a jury, he should at least enjoy the benefit of the political accountability that the Appointments Clause provides for Executive Branch decision making. *See Arthrex*, 594 U.S. at 11–12.

Officers of the United States must be appointed to their offices as required by the Appointments Clause. *Id.* at 12–13. The Appointments Clause "is among the significant structural safeguards of the constitutional scheme." *Edmond v. United*

36

*States*, 520 U.S. 651, 659 (1997). The "'clear and effective chain of command'" it creates provides legitimacy to the exercise of Executive Power and ensures "accountability to the public." *Arthrex*, 594 U.S. at 11.

Any officer may be appointed by the President "with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. "[I]nferior Officers," if Congress so designates, may be appointed by "the President alone," "the Courts of Law," or "the Heads of Departments." *Id.* Whether an officer is inferior "'depends on whether he has a superior' other than the President, and how much power the officer 'exercises free from control by a superior.'" *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2443 (2025) (citations omitted).

USDA's Judicial Officer functions as a principal officer of the United States because he "[a]ct[s] as final deciding officer in [USDA] adjudicatory proceedings." 7 C.F.R. § 2.35; *Arthrex*, 594 U.S. at 23. But for the Judicial Officer to properly exercise officer authority, "the nature of [his] responsibilities" must be "consistent with [his] method of appointment." *Arthrex*, 594 U.S. at 13. It is not.

The Judicial Officer position was created by—and its occupants are appointed by—the Secretary. 10 Fed. Reg. 13,769 (Nov. 9, 1945); JA119–120. Such an appointment is reserved for inferior officers and is inconsistent with the Judicial Officer's principal officer function. *See Arthrex*, 594 U.S. at 14–15. Moreover, even

37

if the Judicial Officer is an inferior officer, he does not hold an office "established by law." *Lucia v. SEC*, 585 U.S. 237, 247 (2018).

## A. The Judicial Officer Functions as a Principal Officer Without a Proper Appointment

The Judicial Officer functions as a principal officer because he makes final decisions for the Executive Branch without the necessary level of supervision from a principal officer. *Arthrex*, 594 U.S. at 13–14. An officer of the United States is an inferior officer only if he is sufficiently "'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Braidwood*, 145 S. Ct. at 2443 (citation omitted). The Supreme Court has provided context-specific guidance for applying this test. *Edmond*, 520 U.S. 651; *Arthrex*, 594 U.S. at 23; *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010); *Braidwood*, 145 S. Ct. 2427. Of its cases, *Arthrex*, 594 U.S. at 23, is the most relevant guidance for an adjudicative officer.

### 1. *Arthrex* Requires Principal Officer Review of Executive Branch Adjudicative Decisions

*Arthrex* considered the officer status of administrative patent judges (APJs) in the Patent and Trademark Office (PTO) and thereby provided the rubric for evaluating the sufficiency of supervision for an adjudicative officer. 594 U.S. at 8. The rule: "Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch" in adjudications. *Id.* at 23.

38

In *Arthrex*, APJs were Executive Branch adjudicative officers who were appointed as inferior officers and issued final decisions in inter partes patent review proceedings. *Id.* at 8–9. APJs' final decision-making authority was inconsistent with their status as inferior officers because they had the "'power to render a final decision on behalf of the United States' without any [] review by" a principal officer. *Id.* at 14. Thus, principal officer review is the critical factor in determining whether an adjudicative officer is a principal or inferior officer. *Id.* at 21.

*Arthrex*'s principal officer review requirement for adjudicative decisions is consistent with the Supreme Court's other inferior officer status cases. In *Edmond*, "[w]hat [was] significant" for inferior officer status of the judges of the Coast Guard Court of Criminal Appeals was that they "ha[d] no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." 520 U.S. at 665. *Arthrex*'s holding that APJs were unconstitutionally exercising principal officer power built on *Edmond*; the Court concluded "[w]hat was 'significant' to the outcome [in *Edmond*]—review by a superior executive officer—[was] absent" in *Arthrex*. 594 U.S. at 14. Similarly, in *Free Enterprise*, Public Company Accounting Oversight Board (PCAOB) members were inferior officers, in part, because the SEC had "approval and alteration" authority for PCAOB sanction decisions. 561 U.S. at 485–86; 510.

39

*Braidwood*, the Court's most recent inferior officer status case, confirms that principal officer review of adjudicative decisions is required. *Braidwood* involved an Appointments Clause challenge to decisions made by members of the U.S. Preventive Services Task Force. 145 S. Ct. at 2440. *Braidwood* held that the Task Force members were inferior officers because they were "directed and supervised" by a principal officer in two ways: at-will removal and the Secretary of Health and Human Service's (HHS Secretary) ability to directly review and block Task Force decisions. *Id.* at 2443–47 (citation and internal quotation marks omitted).

*Braidwood* established that an inferior officer is sufficiently directed and supervised by a principal officer only where that principal officer has the means to revise or reverse an inferior officer's binding decisions before they become effective. *Id.* While the Task Force members were removable, the critical aspect of *Braidwood*'s removability analysis was that the Secretary could use it, along with his statutory power, to delay the effective date of Task Force recommendations and change the recommendations before they became binding. *Id.* at 2445.

Additionally, *Braidwood* highlighted the significance of principal officer review in the adjudication context. *Braidwood*, citing *Arthrex* and *Edmond*, noted that principal-officer review had "taken on particular importance" in adjudications. *Id.* It also affirmed that the "almost-universal model of adjudication in the Executive Branch" is "for principal officers to have the capacity to review decisions made by

40

inferior adjudicative officers." *Id.* at 2450 (citations and internal quotation marks omitted). Thus, in adjudications like this one, *Arthrex*'s principal officer review requirement continues to control because the principal officer must be able to change an inferior officer's decision. 594 U.S. at 23.

### 2. The Judicial Officer's Decisions Cannot Be Reviewed by a Principal Officer

Despite the Judicial Officer's inferior officer appointment, the Secretary is barred by statute from reviewing his final adjudicative decisions in HPA cases. 7 U.S.C. § 2204-3. The Judicial Officer's final decision-making authority comes through a delegation from the Secretary. 7 C.F.R. §§ 1.145(i), 2.35(a)(1). But the statute authorizing the delegation makes it irrevocable at least once the Judicial Officer issues his decision, thereby prohibiting principal officer review. 7 U.S.C. §§ 2204-2, 2204-3.

Once a delegation is made through 7 U.S.C. § 2204-2, final decision-making authority is "vested by law in the" Judicial Officer "instead of in the Secretary of Agriculture." *Id.* § 2204-3. § 2204-3 also prohibits a retroactive revocation of authority. *Id.* This restriction statutorily prohibits principal officer review of Judicial Officer decisions. Once the Judicial Officer issues his final decision in a case, any effort by the Secretary to revoke the delegation and review the decision would be retroactive, and thus prohibited by § 2204-3. Indeed, even after a complaint is filed,

a revocation of the Judicial Officer's decision-making authority for that adjudication is unlawfully retroactive because the Secretary "is obliged to follow" her established rules. *Ballard v. Comm'r*, 544 U.S. 40, 59 (2005).

An ad hoc regulatory workaround would be necessary for the Secretary to review Judicial Officer decisions because the Secretary is not part of the adjudication process. 7 C.F.R. §§ 1.145, 2.35. But any efforts by the Secretary to engineer a regulatory workaround to 7 U.S.C. § 2204-3 are prohibited by the Fifth Amendment's Due Process Clause. *Utica Packing Co. v. Block*, 781 F.2d 71, 78 (6th Cir. 1986). The Sixth Circuit has already resolved this question in *Utica Packing*. There, the Secretary reversed the Judicial Officer's decision in a USDA adjudication by revoking the Judicial Officer's authority over the case, reassigning the case to another person in USDA, and then moving for reconsideration. *Id.* at 72, 74. That maneuver denied the defendant his due process right to a fair trial because it created a "risk of unfairness" that was "'intolerably high.'" *Id.* at 78. "There is no guarantee of fairness when the one who appoints a judge has the power to remove the judge before the end of proceedings for rendering a decision which displeases the appointer." *Id.* at 78.

The district court argued that the Secretary retained ultimate control over the structure of the adjudication process and each adjudication giving her the ability to review Judicial Officer decisions. JA255–263. But there are three problems with the

42

district court's approach. (1) The ability of the Secretary to rearrange the adjudication process does not allow the Secretary to review the Judicial Officer's decisions. (2) The Secretary is statutorily prohibited from retaining adjudication authority when she delegates it to the Judicial Officer. (3) The district court's proposed method for principal officer review is unconstitutional.

First, the district court distinguished the USDA adjudication process from *Arthrex* because the Judicial Officer exercises final decision-making authority pursuant to a regulation, not a statute. JA261–263. But the Appointments Clause violation in *Arthrex* was about "the enforcement of statutory *restrictions*," not about a statutory source of decision-making authority. *Arthrex*, 594 U.S. at 27 (emphasis added). Here, Congress has insulated the Judicial Officer's decisions from review by the Secretary through § 2204-3's prohibition on retroactive revocation.

The Secretary's ultimate authority to change the adjudication scheme also does not provide the Secretary with a "means of countermanding the final decision already on the books." *Arthrex*, 594 U.S. at 16. The district court's reliance on *Braidwood* for this point is misplaced. JA262–263. In *Braidwood*, the relevant statute gave the HHS Secretary time to alter the review process or even replace the inferior officers *after* the HHS Secretary had seen each decision. 145 S. Ct. at 2445–46. But the district court acknowledged that the Secretary "could not vitiate prior final decisions issued by a Judicial Officer" through this approach. JA262. Thus, the

43

Judicial Officer retains his "power to render a final decision on behalf of the United States," at least in Manis's adjudication. *Arthrex*, 594 U.S. at 14 (internal quotation marks omitted).

Second, the district court identified several regulations through which the Secretary purported to retain her authority to decide adjudications. JA255–257. USDA regulations provide that, in general, "[n]o delegation of authority by the Secretary ... shall preclude the Secretary ... from exercising any of the authority so delegated." 7 C.F.R. § 2.12. Two definitional provisions also defined the Judicial Officer and the Secretary interchangeably. 7 C.F.R. § 1.132; *id.* § 2.27.

But to the extent that these regulations allow the Secretary to retain adjudicative authority, they are a nullity because they conflict with 7 U.S.C. § 2204-3. USDA, like any agency, is a "creature[] of statute" that "possess[es] only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). Here, Congress restricted the ability of the Secretary to retain adjudicative authority delegated pursuant to § 2204-3. The statute "vest[s] by law" the delegated authority in the delegee "*instead of* in the Secretary." 7 U.S.C. § 2204-3 (emphasis added). Additionally, the district court viewed this authority as limited to allowing the Secretary to take over a case "upon appeal from an ALJ decision," JA256–257, and Manis's adjudication is already before the Judicial Officer, JA221–222.

Third, the district court identified a petition for reconsideration as its only potential avenue for actual principal officer review. JA257–258. But, as discussed, this is foreclosed by the Fifth Amendment Due Process Clause. *Utica Packing* already addressed the intervention of the Secretary to replace the Judicial Officer after his decision and held that it created an intolerable risk of unfairness for an interested party to change the judge to achieve her desired outcome.[5] 781 F.2d at 78. Indeed, "it is imperative" for due process that USDA adjudications "use the procedures which have traditionally been associated with the judicial process." *Hannah v. Larche*, 363 U.S. 420, 442 (1960). Allowing one of the parties to replace the judge is certainly not such a procedure. *Utica Packing*, 781 F.2d at 78.

### 3. Removability Is Ineffective Supervision Where It Provides No Means to Change a Decision Once Made

The ability of the Secretary to remove the Judicial Officer at-will cannot substitute for the lack of principal officer review in this case. In adjudications, removal provides no mechanism by which the principal officer can change the inferior officer's decision. *Arthrex*, 594 U.S. at 16. That is no less true for the Judicial Officer.

---

[5] It is for this reason that the district court's invocation of constitutional avoidance is inappropriate here. JA259–260. The district court's interpretation of 7 U.S.C. § 2204-3 creates its own constitutional problem and is therefore not a "'reasonable' alternative reading" to avoid the Appointments Clause problem. *Braidwood*, 145 S. Ct. at 2460.

*Arthrex*, in addition to establishing principal officer review as necessary for the supervision of inferior officers, also took at-will removal off the table as a sufficient supervisory tool in adjudications. *Id.* at 16–17. In *Arthrex*, in addition to the relevant statute foreclosing principal officer review, the APJs could only be removed for cause. *Id.* at 17. The Court chose to remedy the Appointments Clause violation by eliminating the principal officer review restriction, *not* the removal restriction. *Id.* at 25–26 (plurality op.); *id.* at 44 (Breyer, J., concurring in part and dissenting in part). *Arthrex* concluded this remedy "better reflect[ed] the structure of supervision within the PTO and the nature of APJs' duties." *Id.* at 26 (plurality op.).

*Braidwood* confirmed that at-will removal in isolation was insufficient supervision for Executive Branch adjudicative officers. 145 S. Ct. at 2445 The HHS Secretary's removal authority in *Braidwood* was an effective supervision tool because it gave the HHS Secretary the power to change or reverse the Task Force's decisions. *Id.* at 2444–45. The HHS Secretary had at least one year before a Task Force recommendation became binding to replace Task Force members and request the new members change the Task Force's recommendations. *Id.* at 2445.

Here, in the USDA Adjudication, the ability of the Secretary to remove the Judicial Officer at will provides no means for the Secretary to change the Judicial Officer's decisions; there is therefore insufficient supervision. *See Arthrex*, 594 U.S. at 13–17. There is no equivalent waiting period to *Braidwood*. 145 S. Ct. at 2445.

46

Nor does the nature of an adjudicative decision allow for it to be revisited once it is final. *See Arthrex*, 594 U.S. at 26 (plurality op.). Once the Judicial Officer issues a final decision, the Secretary cannot intervene, 7 U.S.C. § 2204-3, and the respondent's only option is to seek judicial review, 7 C.F.R. § 1.145(i).

### 4. None of the Secretary's Other Supervisory Tools Replaces the Lack of Principal Officer Review

Any additional supervisory tools held by the Secretary also cannot compensate for the lack of principal officer review. They do not provide the ability for the Secretary to change or reverse the decision of the Judicial Officer. *See Arthrex*, 594 U.S. at 14.

In *Arthrex*, the PTO Director had multiple additional tools to oversee the APJs: setting their pay, initiating inter partes review, selecting the APJs, and establishing the substantive rules. *Id.* Indeed, the Director was "the boss, except when it c[ame] to … their power to issue decisions on patentability." *Id.* Yet, these oversight mechanisms did not rescue the inferior officer status of the APJs. *Id.* at 23.

The Judicial Officer presents a similar situation. The Judicial Officer is subject to administrative oversight from the Secretary through USDA's Uniform Rules of Practice, 7 C.F.R. § 1.131, and the substantive regulations implementing the HPA, 9 C.F.R. § 11.1 *et seq*. And the Judicial Officer decides appeals in USDA adjudications based on the closed record and "matter[s] of which official notice is taken." 7 C.F.R.

§ 1.145(i). He does so "independently" and with "[u]nlimited authority;" "[n]o supervision or direction is received."[6] *In re World Wide Citrus*, 50 Agric. Dec. 319, 331–32 (U.S.D.A. 1991). This is not sufficient supervision by a principal officer in an adjudication. *Arthrex*, 594 U.S. at 14.

The Judicial Officer's appointment by the Secretary is incompatible with his ability to issue final, unreviewable decisions for USDA in adjudications, a principal officer function. *See Arthrex*, 594 U.S. at 23. Thus, the Judicial Officer is exercising his final decision-making authority in violation of the Appointments Clause. *See id.*

**B. The Judicial Officer Does Not Hold an Office Created by Statute**

Even if the Judicial Officer functions as an inferior officer, he still cannot exercise that authority because Congress did not create an office for the Judicial Officer. *See Lucia*, 585 U.S. at 247–48

For an office to be "established by Law" pursuant to the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, it must be "created by statute, down to its 'duties, salary,

---

[6] The district court also identified several other supervision mechanisms, which do not alter the analysis. JA263–264. Neither the Judicial Officer's annual performance reviews, JA120, nor the regulatory requirement to give notice to the Secretary of "the application of new principles of major importance or a departure from principles established by the Secretary," 7 C.F.R. § 2.11, authorize the Secretary to review the Judicial Officer's decisions. Additionally, the Secretary's statutory authority to "compromise, modify, or remit" assessed civil penalties does not authorize her to change any disqualification penalty nor to modify or reverse the Judicial Officer's liability finding. 15 U.S.C. § 1825(b)(4).

and means of appointment.'" *Lucia*, 585 U.S. at 248; *see also Burnap*, 252 U.S. at 516; *New Mexico v. Musk*, 784 F. Supp. 3d 184, 202 (D.D.C. 2025) (compiling cases). Chief Justice John Marshall observed that "the general spirit of the constitution ... seems to have arranged the creation of office among legislative powers." *United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (Marshall, C.J.).

For example, in *Burnap*, the Supreme Court found that a landscape architect was not an officer because no statute created his position or "define[d its] duties." 252 U.S. at 517. The Court explained that whether someone holds an office or is an employee "is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties and appointment thereto." *Id.* at 516. The district court pushed aside *Lucia* as not having decided the question of statutory office creation and relied on the placement of a conjunction in *Freytag* to dismiss it as not having addressed the question either. JA268–269. But that is inconsistent with *Burnap*. 252 U.S. at 516–17.

Congress also cannot hand off the power to create and appoint new inferior officers wholesale to Executive Branch departments. JA269–271. Blanket delegations do not actually establish any offices by law and are inconsistent with *Burnap*. 252 U.S. at 516–17. Indeed, the Sixth Circuit, applying *Burnap,* concluded that "the sounder rule [is] that an office of the United States does not exist unless it

49

is created by some specific Act of Congress." *Beal v. United States*, 182 F.2d 565, 568 (6th Cir. 1950).

The lack of a statutorily created office is doubly problematic for an inferior officer appointed by a head of department. The Appointments Clause only permits inferior officers to be appointed by a head of department if Congress "vest[ed]" that authority in him "by Law." U.S. Const. art. II, § 2, cl. 2. And logically, "the power of appointment … cannot arise until Congress creates the office." *Myers v. United States*, 272 U.S. 52, 130 (1926).

Here, the Judicial Officer is solely a creation of the Secretary pursuant to 7 U.S.C. § 2204-2, not Congress.[7] 7 C.F.R. § 2.35; 10 Fed. Reg. at 13,769. But nothing in § 2204-2 establishes the "duties, salary, and means of appointment" of the Judicial Officer; the position is not even mentioned. *Lucia*, 585 U.S. at 248 (internal quotation marks omitted); 7 U.S.C. § 2204-2; 18 Fed. Reg. at 3219–21.

Instead, 7 U.S.C. § 2204-2 sets up a two-step process by which the Secretary empowers an employee or officer already within USDA to exercise some or all of her adjudicative authority. First, the Secretary makes a decision whether to "delegate[e]" and thereby relinquish the adjudicative authority she possesses. 7

---

[7] The Secretary's delegation to the Judicial Officer also cites Reorganization Plan No. 2 of 1953, which similarly authorizes the Secretary to delegate to "any other officer, or [] any agency or employee, of [USDA]." 18 Fed. Reg. 3219, 3221 (June 5, 1953), *reprinted as amended in* 5 U.S.C. app. at 145–46.

U.S.C. § 2204-2. Second, the Secretary "designate[s] officers or employees *of the Department*" to exercise the delegated authority and, if she chooses, "assign[s] appropriate titles." *Id.* (emphasis added). This statutory authorization allows the Secretary to select who will exercise her delegated authority among those already working within USDA.

The power to designate preexisting officers or employees to exercise delegated authority is distinct from the power to appoint someone to an office in the first instance, which Congress specifically grants. *See Edmond*, 520 U.S. at 657. While *Braidwood* observed that "[a]round the time of the Founding, the verb appoint was synonymous with allot, assign, or designate." 145 S. Ct. at 2454 (cleaned up), the word "designate" must still be read in its context, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). For example, *Edmond* distinguished "assign" as something a "superior officer" does to give a "position or duty" as opposed to authorizing a "separate appointment" to an "office." 520 U.S. at 657–58 (cleaned up); *see also Auffmordt v. Hedden*, 137 U.S. 310, 326–27 (1890) ("select" insufficient to authorize appointment). And Congress has similarly distinguished between "appoint" and "assign" for positions within USDA. 7 U.S.C. § 1762(a) (the Secretary may "appoint" new personnel and then "assign" them to posts abroad).

The statutory history confirms this interpretation because Congress affirmatively decided *not* to create a new office held by a principal officer to conduct

51

USDA adjudications when it enacted § 2204-2. *See In re World Wide Citrus*, 50 Agric. Dec. at 335–44. When the Schwellenbach Act was initially passed by the Senate, it included a new office that required a presidential appointment and Senate confirmation. *Id.* at 335–36. But the House of Representatives passed a version of the bill using the delegation approach. *Id.* at 338–40. Congress adopted the House's approach and the Chairman of the House Agriculture Committee explained that the final version of the bill "'eliminate[d] the additional position and require[d] the hearings ... to be conducted before authorities [then] in the Department.'" *Id.* at 342 (citation omitted). Congress cannot have established what it explicitly refused to do.

## V.    This Court Should Order the Entry of a Permanent Injunction

Because the USDA Adjudication is unconstitutionally structured and cannot lawfully occur within the Executive Branch, this Court should permanently enjoin it. To obtain a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Manis has satisfied all four permanent injunction factors. First, he is suffering an irreparable injury by being subjected "to an unconstitutionally structured

52

decisionmaking process." *Axon*, 598 U.S. at 192; *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) ("[A] deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"). This injury "cannot be undone" and will be "impossible to remedy once the proceeding is over."[8] *Axon*, 598 U.S. at 191. Second, legal remedies are also inadequate because Manis will otherwise "lose [his] rights not to undergo the complained-of agency proceedings." *Id.* at 192. Because this injury cannot be remedied with money damages, legal remedies are inadequate. See *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011); 5 U.S.C. § 702.

Third, the balance of harms weighs in Manis's favor because, irrespective of the desirability of this administrative adjudication, "our system does not permit agencies to act unlawfully." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021). More specifically, Defendants would only be enjoined from proceeding with this adjudication whereas, without an injunction, Manis loses out entirely on a remedy for his claims. *See Axon*, 598 U.S. at 190–92. Fourth,

---

[8] This Court previously affirmed the district court's denial of a preliminary injunction on the grounds that Manis had not demonstrated an irreparable injury. *Manis*, 2025 WL 2389422, at *3–*5. But now the case is on appeal after a final judgment. Since this court has subject matter jurisdiction over these collateral constitutional claims because Manis's harm "is impossible to remedy once the [USDA Adjudication] is over," this court must now be able to provide a remedy (i.e., a permanent injunction) if he prevails. *Axon*, 598 U.S. at 191.

because the government has no interest in pursuing an unconstitutional adjudication, an injunction is also in the public interest. *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

## CONCLUSION

For the forgoing reasons, the district court's judgment of dismissal should be reversed, judgment entered for Manis, and the district court ordered to permanently enjoin the USDA Adjudication.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument is requested. This case presents constitutional issues concerning the structure of USDA internal adjudications. Given the significance of Manis's constitutional claims for all parties, oral argument would help the court to decide whether USDA's adjudication process is constitutionally structured.

DATED: October 3, 2025.

Respectfully submitted,

/s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS
ALLISON D. DANIEL
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
(202) 945-9524
JRobbins@pacificlegal.org
ADaniel@ pacificlegal.org

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,752 words excluding the parts exempt by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: October 3, 2025.

/s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, I electronically transmitted the foregoing document to the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system and transmittal of a Notice of Docket Activity was sent to counsel of record.

s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS

Case No. 25-2001

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

JOE MANIS,

*Appellant*,

---v.---

U.S. DEPARTMENT OF AGRICULTURE; THOMAS JAMES VILSACK, in his official capacity as the Secretary of Agriculture; MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Health Inspection Service,

*Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:24-CV-00175-WO-JLW

---

**ADDENDUM TO APPELLANT'S OPENING BRIEF**

---

JOSHUA M. ROBBINS
ALLISON D. DANIEL
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 945-9524
JRobbins@pacificlegal.org
ADaniel@pacificlegal.org

*Counsel for Appellant*

## Table of Contents

| Document | Page |
|---|---|
| U.S. Const. amend. VII | ADD001 |
| U.S. Const. art. II, § 2, cl. 2 | ADD003 |
| 7 U.S.C. § 2204-2 | ADD004 |
| 7 U.S.C. § 2204-3 | ADD004 |
| 15 U.S.C. § 1822 | ADD005 |
| 15 U.S.C. § 1824 | ADD005 |
| 15 U.S.C. § 1825 | ADD007 |
| 7 C.F.R. § 1.132 | ADD009 |
| 7 C.F.R. § 1.145 | ADD011 |
| 7 C.F.R. § 2.12 | ADD013 |
| 7 C.F.R. § 2.27 | ADD014 |
| 7 C.F.R. § 2.35 | ADD016 |

committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

## Amendment VII.

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

## Amendment VIII.

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

## Amendment IX.

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

## Amendment X.

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

## Amendment XI.

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

## Amendment XII.

The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;— The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be

20

# Article. II.

**Section. 1.** The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted. The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no Person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote; A quorum for this Purpose shall consist of a Member or Members from two thirds of the States, and a Majority of all the States shall be necessary to a Choice. In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.

The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected. The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

10

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:—"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

**Section. 2.** The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment.

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

**Section. 3.** He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

**Section. 4.** The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

## Article. III.

**Section. 1.** The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

**Section. 2.** The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two

11

ized or required by law, and (2) any action which is required or authorized to be performed before, after, or in connection with, such determining, making, prescribing, issuing, or promulgating.

(Apr. 4, 1940, ch. 75, §1, 54 Stat. 81.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450c of this title prior to editorial reclassification and renumbering as this section, and to section 516a of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

## § 2204–2. Delegation of regulatory functions to designated employees; status of employees; number; revocation of delegation

Whenever the Secretary of Agriculture deems that the delegation of the whole or any part of any regulatory function which the Secretary is, now or after April 4, 1940, required or authorized to perform will result in the more expeditious discharge of the duties of the Department of Agriculture, he is authorized to make such delegation to any officer or employee designated under this section. The Secretary is authorized to designate officers or employees of the Department to whom functions may be delegated under this section and to assign appropriate titles to such officers or employees. There shall not be in the Department at any one time more than two officers or employees designated under this section and vested with a regulatory function or part thereof delegated under this section. The Secretary may at any time revoke the whole or any part of a delegation or designation made by him under this section.

(Apr. 4, 1940, ch. 75, §2, 54 Stat. 81; Pub. L. 89–554, §8(a), Sept. 6, 1966, 80 Stat. 632, 650.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450d of this title prior to editorial reclassification and renumbering as this section, and to section 516b of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

#### AMENDMENTS

1966—Pub. L. 89–554 repealed third sentence which related to grade of a position. See section 5109 of Title 5, Government Organization and Employees.

## § 2204–3. Authority of designated employees; retroactive revocation of delegation

Whenever a delegation is made under section 2204–2 of this title, all provisions of law shall be construed as if the regulatory function or the part thereof delegated had (to the extent of the delegation) been vested by law in the individual to whom the delegation is made, instead of in the Secretary of Agriculture. A revocation of delegation shall not be retroactive, and each regulatory function or part thereof performed (within the scope of the delegation) by such individual prior to the revocation shall be considered as having been performed by the Secretary.

(Apr. 4, 1940, ch. 75, §3, 54 Stat. 82.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450e of this title prior to editorial reclassification and renumbering as this section, and to section 516c of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

## § 2204–4. Delegation of functions under other laws as unaffected

The provisions of section 2204–2 of this title shall not be deemed to prohibit the delegation, under authority of any other provision of law, of the whole or any part of any regulatory function or other function to any officer or employee of the Department of Agriculture.

(Apr. 4, 1940, ch. 75, §4, 54 Stat. 82.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450f of this title prior to editorial reclassification as this section, and to section 516d of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

## § 2204–5. Authorization of appropriations for cooperative research projects

There is authorized to be appropriated such sums as may be necessary to carry out the purposes of sections 2204–1 to 2204–5 of this title.

(Apr. 4, 1940, ch. 75, §5, 54 Stat. 82.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450g of this title prior to editorial reclassification as this section, and to section 516e of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

## § 2204a. Rural development; utilization of non-Federal offices; location of field units; interchange of personnel and facilities

The Secretary of Agriculture shall utilize to the maximum extent practicable State, regional, district, county, local, or other Department of Agriculture offices to enhance rural development, and shall to the maximum extent practicable provide directly, or, in the case of agencies outside of the Department of Agriculture, through arrangements with the heads of such agencies, for—

(1) the location of all field units of the Federal Government concerned with rural development in the appropriate Department of Agriculture offices covering the geographical areas most similar to those covered by such field units, and

(2) the interchange of personnel and facilities in each such office to the extent necessary or desirable to achieve the most efficient utilization of such personnel and facilities and pro-

SHORT TITLE

Pub. L. 91–540, § 1, Dec. 9, 1970, 84 Stat. 1404, as amended by Pub. L. 94–360, § 2, July 13, 1976, 90 Stat. 915, provided: ''That this Act [enacting this chapter] may be cited as the 'Horse Protection Act'.''

**Executive Documents**

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## § 1822. Congressional statement of findings

The Congress finds and declares that—

(1) the soring of horses is cruel and inhumane;

(2) horses shown or exhibited which are sore, where such soreness improves the performance of such horse, compete unfairly with horses which are not sore;

(3) the movement, showing, exhibition, or sale of sore horses in intrastate commerce adversely affects and burdens interstate and foreign commerce;

(4) all horses which are subject to regulation under this chapter are either in interstate or foreign commerce or substantially affect such commerce; and

(5) regulation under this chapter by the Secretary is appropriate to prevent and eliminate burdens upon commerce and to effectively regulate commerce.

(Pub. L. 91–540, § 3, Dec. 9, 1970, 84 Stat. 1405; Pub. L. 94–360, § 4, July 13, 1976, 90 Stat. 915.)

### Editorial Notes

AMENDMENTS

1976—Pub. L. 94–360, among other changes, inserted findings stating that all horses subject to regulation under this chapter are either in interstate or foreign commerce or substantially affect interstate or foreign commerce, and that regulation by the Secretary is appropriate to eliminate burdens upon commerce.

## § 1823. Horse shows and exhibitions

### (a) Disqualification of horses

The management of any horse show or horse exhibition shall disqualify any horse from being shown or exhibited (1) which is sore or (2) if the management has been notified by a person appointed in accordance with regulations under subsection (c) or by the Secretary that the horse is sore.

### (b) Prohibited activities

The management of any horse sale or auction shall prohibit the sale or auction or exhibition for the purpose of sale of any horse (1) which is sore or (2) if the management has been notified by a person appointed in accordance with regulations under subsection (c) or by the Secretary that the horse is sore.

### (c) Appointment of inspectors; manner of inspections

The Secretary shall prescribe by regulation requirements for the appointment by the management of any horse show, horse exhibition, or

horse sale or auction of persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter. Such requirements shall prohibit the appointment of persons who, after notice and opportunity for a hearing, have been disqualified by the Secretary to make such detection, diagnosis, or inspection. Appointment of a person in accordance with the requirements prescribed under this subsection shall not be construed as authorizing such person to conduct inspections in a manner other than that prescribed for inspections by the Secretary (or the Secretary's representative) under subsection (e).

### (d) Recordkeeping and reporting requirements; availability of records

The management of a horse show, horse exhibition, or horse sale or auction shall establish and maintain such records, make such reports, and provide such information as the Secretary may by regulation reasonably require for the purposes of implementing this chapter or to determine compliance with this chapter. Upon request of an officer or employee duly designated by the Secretary, such management shall permit entry at all reasonable times for the inspection and copying (on or off the premises) of records required to be maintained under this subsection.

### (e) Inspection by Secretary or duly appointed representative

For purposes of enforcement of this chapter (including any regulation promulgated under this chapter) the Secretary, or any representative of the Secretary duly designated by the Secretary, may inspect any horse show, horse exhibition, or horse sale or auction or any horse at any such show, exhibition, sale, or auction. Such an inspection may only be made upon presenting appropriate credentials. Each such inspection shall be commenced and completed with reasonable promptness and shall be conducted within reasonable limits and in a reasonable manner. An inspection under this subsection shall extend to all things (including records) bearing on whether the requirements of this chapter have been complied with.

(Pub. L. 91–540, § 4, Dec. 9, 1970, 84 Stat. 1405; Pub. L. 94–360, § 5, July 13, 1976, 90 Stat. 916.)

### Editorial Notes

AMENDMENTS

1976—Pub. L. 94–360 substituted provisions relating to the inspection and disqualification of horses participating in horse shows and exhibitions, the issuance of regulations by the Secretary, and the maintenance of records by horse show management, for provisions prohibiting as constituting unlawful acts the exhibition of sored horses, the transportation in commerce for purposes of exhibition of any horse that had been sored, and the conducting of any show or exhibition in which sored horses appear. Provisions now covering such unlawful acts are set out as section 1824 of this title.

## § 1824. Unlawful acts

The following conduct is prohibited:

(1) The shipping, transporting, moving, delivering, or receiving of any horse which is sore with reason to believe that such horse

while it is sore may be shown, exhibited, entered for the purpose of being shown or exhibited, sold, auctioned, or offered for sale, in any horse show, horse exhibition, or horse sale or auction; except that this paragraph does not apply to the shipping, transporting, moving, delivering, or receiving of any horse by a common or contract carrier or an employee thereof in the usual course of the carrier's business or employee's employment unless the carrier or employee has reason to believe that such horse is sore.

(2) The (A) showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore, (B) entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore, (C) selling, auctioning, or offering for sale, in any horse sale or auction, any horse which is sore, and (D) allowing any activity described in clause (A), (B), or (C) respecting a horse which is sore by the owner of such horse.

(3) The failure by the management of any horse show or horse exhibition, which does not appoint and retain a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse which is sore.

(4) The failure by the management of any horse sale or auction, which does not appoint and retain a qualified person in accordance with section 1823(c) of this title, to prohibit the sale, offering for sale, or auction of any horse which is sore.

(5) The failure by the management of any horse show or horse exhibition, which has appointed and retained a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse (A) which is sore, and (B) after having been notified by such person or the Secretary that the horse is sore or after otherwise having knowledge that the horse is sore.

(6) The failure by the management of any horse sale or auction which has appointed and retained a person in accordance with section 1823(c) of this title, to prohibit the sale, offering for sale, or auction of any horse (A) which is sore, and (B) after having been notified by such person or the Secretary or after otherwise having knowledge that the horse is sore.

(7) The showing or exhibiting at a horse show or horse exhibition; the selling or auctioning at a horse sale or auction; the allowing to be shown, exhibited, or sold at a horse show, horse exhibition, or horse sale or auction; the entering for the purpose of showing or exhibiting in any horse show or horse exhibition; or offering for sale at a horse sale or auction, any horse which is wearing or bearing any equipment, device, paraphernalia, or substance which the Secretary by regulation under section 1828 of this title prohibits to prevent the soring of horses.

(8) The failing to establish, maintain, or submit records, notices, reports, or other information required under section 1823 of this title.

(9) The failure or refusal to permit access to or copying of records, or the failure or refusal to permit entry or inspection, as required by section 1823 of this title.

(10) The removal of any marking required by the Secretary to identify a horse as being detained.

(11) The failure or refusal to provide the Secretary with adequate space or facilities, as the Secretary may by regulation under section 1828 of this title prescribe, in which to conduct inspections or any other activity authorized to be performed by the Secretary under this chapter.

(Pub. L. 91–540, §5, Dec. 9, 1970, 84 Stat. 1405; Pub. L. 94–360, §6, July 13, 1976, 90 Stat. 916.)

### Editorial Notes
#### Amendments

1976—Pub. L. 94–360 substituted provisions prohibiting the transportation, receipt, exhibition, sale, or auction of a sored horse, and the showing, sale or auction of a horse bearing any device or substance prohibited by regulation of the Secretary, and making the management of a horse show, exhibition, or sale, responsible for failure to disqualify such horses from participating, and for interfering with the conducting of inspections by the Secretary of horses in the show or of the management records, for provisions authorizing the inspection of horses, transported in commerce, and requiring the management of shows and exhibitions to maintain such records as the Secretary prescribes. Provisions now covering the maintenance of records and the inspection of horses are set out as section 1823 of this title.

## § 1824a. Export of horses

### (a) Restriction on export of horses

Notwithstanding any other provision of law, no horse may be exported by sea from the United States, or any of its territories or possessions, unless such horse is part of a consignment of horses with respect to which a waiver has been granted under subsection (b).

### (b) Granting of waivers

The Secretary of Commerce, in consultation with the Secretary of Agriculture, may issue regulations providing for the granting of waivers permitting the export by sea of a specified consignment of horses, if the Secretary of Commerce, in consultation with the Secretary of Agriculture, determines that no horse in that consignment is being exported for purposes of slaughter.

### (c) Penalties

#### (1) Criminal penalty

Any person who knowingly violates this section or any regulation, order, or license issued under this section shall be fined not more than 5 times the value of the consignment of horses involved or $50,000, whichever is greater, or imprisoned not more than 5 years, or both.

#### (2) Civil penalty

The Secretary of Commerce, after providing notice and an opportunity for an agency hearing on the record, may impose a civil penalty of not to exceed $10,000 for each violation of this section or any regulation, order, or license issued under this section, either in addition to or in lieu of any other liability or penalty which may be imposed.

(Mar. 3, 1891, ch. 521, §3, as added Pub. L. 99–64, title I, §125, July 12, 1985, 99 Stat. 156.)

**Editorial Notes**

CODIFICATION

Section was not enacted as part of the Horse Protection Act of 1970 which comprises this chapter.

Section was classified to section 466c of the former Appendix to Title 46, prior to the completion of the enactment of Title 46, Shipping, by Pub. L. 109–304, Oct. 6, 2006, 120 Stat. 1485.

PRIOR PROVISIONS

Provisions similar to those in this section were contained in section 7(j) of Pub. L. 96–72, formerly classified to section 4606(j) of Title 50, War and National Defense, prior to the amendment of section 7(j) of that Act by Pub. L. 99–64, which enacted this section.

## § 1825. Violations and penalties

### (a) Criminal acts and penalties

(1) Except as provided in paragraph (2) of this subsection, any person who knowingly violates section 1824 of this title shall, upon conviction thereof, be fined not more than $3,000, or imprisoned for not more than one year, or both.

(2)(A) If any person knowingly violates section 1824 of this title, after one or more prior convictions of such person for such a violation have become final, such person shall, upon conviction thereof, be fined not more than $5,000, or imprisoned for not more than two years, or both.

(B) Any person who knowingly makes, or causes to be made, a false entry or statement in any report required under this chapter; who knowingly makes, or causes to be made, any false entry in any account, record, or memorandum required to be established and maintained by any person or in any notification or other information required to be submitted to the Secretary under section 1823 of this title; who knowingly neglects or fails to make or cause to be made, full, true, and correct entries in such accounts, records, memoranda, notification, or other materials; who knowingly removes any such documentary evidence out of the jurisdiction of the United States; who knowingly mutilates, alters, or by any other means falsifies any such documentary evidence; or who knowingly refuses to submit any such documentary evidence to the Secretary for inspection and copying shall be guilty of an offense against the United States, and upon conviction thereof shall be fined not more than $5,000, or imprisoned for not more than three years, or both.

(C) Any person who forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person while engaged in or on account of the performance of his official duties under this chapter shall be fined not more than $5,000, or imprisoned not more than three years, or both. Whoever, in the commission of such acts, uses a deadly or dangerous weapon shall be fined not more than $10,000, or imprisoned not more than ten years, or both. Whoever kills any person while engaged in or on account of the performance of his official duties under this chapter shall be punishable as provided under sections 1111 and 1112 of title 18.

### (b) Civil penalties; review and enforcement

(1) Any person who violates section 1824 of this title shall be liable to the United States for a civil penalty of not more than $2,000 for each violation. No penalty shall be assessed unless such person is given notice and opportunity for a hearing before the Secretary with respect to such violation. The amount of such civil penalty shall be assessed by the Secretary by written order. In determining the amount of such penalty, the Secretary shall take into account all factors relevant to such determination, including the nature, circumstances, extent, and gravity of the prohibited conduct and, with respect to the person found to have engaged in such conduct, the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

(2) Any person against whom a violation is found and a civil penalty assessed under paragraph (1) of this subsection may obtain review in the court of appeals of the United States for the circuit in which such person resides or has his place of business or in the United States Court of Appeals for the District of Columbia Circuit by filing a notice of appeal in such court within 30 days from the date of such order and by simultaneously sending a copy of such notice by certified mail to the Secretary. The Secretary shall promptly file in such court a certified copy of the record upon which such violation was found and such penalty assessed, as provided in section 2112 of title 28. The findings of the Secretary shall be set aside if found to be unsupported by substantial evidence.

(3) If any person fails to pay an assessment of a civil penalty after it has become a final and unappealable order, or after the appropriate court of appeals has entered final judgment in favor of the Secretary, the Secretary shall refer the matter to the Attorney General, who shall recover the amount assessed in any appropriate district court of the United States. In such action, the validity and appropriateness of the final order imposing the civil penalty shall not be subject to review.

(4) The Secretary may, in his discretion, compromise, modify, or remit, with or without conditions, any civil penalty assessed under this subsection.

### (c) Disqualification of offenders; orders; civil penalties applicable; enforcement procedures

In addition to any fine, imprisonment, or civil penalty authorized under this section, any person who was convicted under subsection (a) or who paid a civil penalty assessed under subsection (b) or is subject to a final order under such subsection assessing a civil penalty for any violation of any provision of this chapter or any regulation issued under this chapter may be disqualified by order of the Secretary, after notice and an opportunity for a hearing before the Secretary, from showing or exhibiting any horse, judging or managing any horse show, horse exhibition, or horse sale or auction for a period of not less than one year for the first violation and not less than five years for any subsequent violation. Any person who knowingly fails to obey an order of disqualification shall be subject to a civil penalty of not more than $3,000 for each violation. Any horse show, horse exhibition, or horse sale or auction, or the management thereof, collectively and severally, which knowingly

allows any person who is under an order of disqualification to show or exhibit any horse, to enter for the purpose of showing or exhibiting any horse, to take part in managing or judging, or otherwise to participate in any horse show, horse exhibition, or horse sale or auction in violation of an order shall be subject to a civil penalty of not more than $3,000 for each violation. The provisions of subsection (b) of this section respecting the assessment, review, collection, and compromise, modification, and remission of a civil penalty apply with respect to civil penalties under this subsection.

**(d) Production of witnesses and books, papers, and documents; depositions; fees; presumptions; jurisdiction**

(1) The Secretary may require by subpena the attendance and testimony of witnesses and the production of books, papers, and documents relating to any matter under investigation or the subject of a proceeding. Witnesses summoned before the Secretary shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

(2) The attendance of witnesses, and the production of books, papers, and documents, may be required at any designated place from any place in the United States. In case of disobedience to a subpena the Secretary, or any party to a proceeding before the Secretary, may invoke the aid of any appropriate district court of the United States in requiring attendance and testimony of witnesses and the production of such books, papers, and documents under the provisions of this chapter.

(3) The Secretary may order testimony to be taken by deposition under oath in any proceeding or investigation pending before him, at any stage of the proceeding or investigation. Depositions may be taken before any person designated by the Secretary who has power to administer oaths. The Secretary may also require the production of books, papers, and documents at the taking of depositions.

(4) Witnesses whose depositions are taken and the persons taking them shall be entitled to the same fees as paid for like services in the courts of the United States or in other jurisdictions in which they may appear.

(5) In any civil or criminal action to enforce this chapter or any regulation under this chapter a horse shall be presumed to be a horse which is sore if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs.

(6) The United States district courts, the District Court of Guam, the District Court of the Virgin Islands, the highest court of American Samoa, and the United States courts of the other territories, are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of this chapter, and shall have jurisdiction in all other kinds of cases arising under this chapter, except as provided in subsection (b) of this section.

**(e) Detention of horses; seizure and condemnation of equipment**

(1) The Secretary may detain (for a period not to exceed twenty-four hours) for examination, testing, or the taking of evidence, any horse at any horse show, horse exhibition, or horse sale or auction which is sore or which the Secretary has probable cause to believe is sore. The Secretary may require the temporary marking of any horse during the period of its detention for the purpose of identifying the horse as detained. A horse which is detained subject to this paragraph shall not be moved by any person from the place it is so detained except as authorized by the Secretary or until the expiration of the detention period applicable to the horse.

(2) Any equipment, device, paraphernalia, or substance which was used in violation of any provision of this chapter or any regulation issued under this chapter or which contributed to the soring of any horse at or prior to any horse show, horse exhibition, or horse sale or auction, shall be liable to be proceeded against, by process of libel for the seizure and condemnation of such equipment, device, paraphernalia, or substance, in any United States district court within the jurisdiction of which such equipment, device, paraphernalia, or substance is found. Such proceedings shall conform as nearly as possible to proceedings in rem in admiralty.

(Pub. L. 91–540, §6, Dec. 9, 1970, 84 Stat. 1406; Pub. L. 94–360, §7, July 13, 1976, 90 Stat. 918.)

### Editorial Notes

#### Amendments

1976—Subsec. (a). Pub. L. 94–360 substituted provisions increasing the maximum amount of fine that can be imposed and the maximum length of imprisonment that can be ordered for knowingly performing enumerated activities prohibited under this chapter, for provisions authorizing a maximum civil penalty of $1,000 for each unintentional violation of this chapter, requiring notice to an alleged violator prior to assessment of any penalty and authorizing the institution of civil actions by the Attorney General to enforce such penalties.

Subsec. (b). Pub. L. 94–360 substituted provisions relating to imposition of civil penalties up to $2,000, criteria for imposition of particular amounts, and procedures for review and enforcement of civil penalties, for provisions authorizing fines up to $2,000 and/or imprisonment up to six months for intentional violations of provisions of this chapter or any regulation issued thereunder.

Subsecs. (c) to (e). Pub. L. 94–360 added subsecs. (c) to (e).

## § 1826. Notice of violations to Attorney General

Whenever the Secretary believes that a willful violation of this chapter has occurred and that prosecution is needed to obtain compliance with this chapter, he shall inform the Attorney General and the Attorney General shall take such action with respect to such matter as he deems appropriate.

(Pub. L. 91–540, §7, Dec. 9, 1970, 84 Stat. 1406.)

## § 1827. Utilization of personnel of Department of Agriculture and officers and employees of consenting States; technical and other nonfinancial assistance to State

**(a) Assistance from Department of Agriculture and States**

The Secretary, in carrying out the provisions of this chapter, shall utilize, to the maximum extent practicable, the existing personnel and

Honey Research, Promotion, and Consumer Information Act, section 11 (7 U.S.C. 4610).
Horse Protection Act of 1970, sections 4(c) and 6 (15 U.S.C. 1823(c), 1825).
Lacey Act Amendments of 1981, section 4 (a) and (b) (16 U.S.C. 3373 (a) and (b)).
Lime Research, Promotion, and Consumer Information Act of 1990, as amended, section 1958 [7 U.S.C. 6207]
Mineral Leasing Act, section 28(o)(1) (30 U.S.C. 185(o)(1)).
Mushroom Promotion, Research, and Consumer Information Act of 1990, section 1928 [7 U.S.C. 6107]
National Forest Roads and Trails Act (16 U.S.C. 534).
Organic Foods Production Act of 1990, sections 2119 and 2120 (7 U.S.C. 6519, 6520).
Packers and Stockyards Act, 1921, as supplemented, sections 203, 312, and 401 of the Act, and section 1, 57 Stat. 422, as amended by section 4, 90 Stat. 1249 (7 U.S.C. 193, 204, 213, 221)
Pecan Promotion and Research Act of 1990, section 1914 [7 U.S.C. 6009]
Perishable Agricultural Commodities Act, 1930, sections 1(b)(9), 3(c), 4(d), 6(c), 8(a), 8(b), 8(c), 8(e), 9, and 13(a) (7 U.S.C. 499a(b)(9), 499c(c), 499d(d), 499f(c), 499h(a), 499h(b), 499h(c), 499h(e), 499i, 499m(a))
Plant Protection Act, section 424 (7 U.S.C. 7734).
Pork Promotion, Research, and Consumer Information Act of 1985, section 1626 (7 U.S.C. 4815).
Potato Research and Promotion Act, as amended, 7 U.S.C. 2621, Pub. L. 97–244, 96 Stat. 310.
Poultry Products Inspection Act, sections 6, 7, 8(d), and 18 (21 U.S.C. 455, 456, 457(d), 467).
Sheep Promotion, Research, and Information Act of 1994 [7 U.S.C. 7107].
Soybean Promotion, Research, and Consumer Information Act, section 1972 [7 U.S.C. 6307].
Swine Health Protection Act, sections 5 and 6 (7 U.S.C. 3804, 3805).
Title V of the Agricultural Risk Protection Act of 2000, section 501(a) (7 U.S.C. 2279e).
United States Cotton Standards Act, as supplemented, section 3 of the Act and section 2 of 47 Stat. 1621 (7 U.S.C. 51b, 53).
United States Grain Standards Act, sections 7(g)(3), 9, 10, and 17A(d) (7 U.S.C. 79(g)(3), 85, 86, 87f–1(d)).
United States Warehouse Act, sections 12 and 25 (7 U.S.C. 246, 253).
Virus-Serum-Toxin Act (21 U.S.C. 156).
Watermelon Research and Promotion Act, section 1651 (7 U.S.C. 4910).

(b) These rules of practice shall also be applicable to:

(1) Adjudicatory proceedings under the regulations promulgated under the Agricultural Marketing Act of 1946 (7 U.S.C. 1621 *et seq.*) for the denial or withdrawal of inspection, certification, or grading service;[1]

(2) Adjudicatory proceedings under the regulations promulgated under the Animal Health Protection Act (7 U.S.C. 8301 *et seq.*) for the suspension or revocation of accreditation of veterinarians (9 CFR parts 160, 161);

(3) Proceedings for debarment of counsel under §1.141(d) of this subpart;

(4) Adjudicatory proceedings under the regulations promulgated under the Animal Welfare Act (7 U.S.C. 2131 *et seq.*) for the denial of an initial license application (9 CFR 2.11) or the termination of a license during the license renewal process or at any other time (9 CFR 2.12);

(5) Adjudicatory proceedings under the regulations promulgated under sections 901–905 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note) pertaining to the commercial transportation of equines to slaughtering facilities (9 CFR part 88); and

(6) Other adjudicatory proceedings in which the complaint instituting the proceeding so provides with the concurrence of the Assistant Secretary for Administration.

[42 FR 743, Jan. 4, 1977]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §1.131, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

§ 1.132  Definitions.

As used in this subpart, the terms as defined in the statute under which the proceeding is conducted and in the regulations, standards, instructions, or orders issued thereunder, shall apply with equal force and effect. In addition and except as may be provided otherwise in this subpart:

*Administrator* means the Administrator of the Agency administering the statute involved, or any officer or employee of the Agency to whom authority has heretofore been delegated, or to whom authority may hereafter be delegated, to act for the Administrator.

*Complainant* means the party instituting the proceeding.

*Complaint* means the formal complaint, order to show cause, or other

**Office of the Secretary, USDA**                                    **§ 1.133**

document by virtue of which a proceeding is instituted.

*Decision* means: (1) The Judge's initial decision made in accordance with the provisions of 5 U.S.C. 556 and 557, and includes the Judge's (i) findings and conclusions and the reasons or basis therefor on all material issues of fact, law or discretion, (ii) order, and (iii) rulings on proposed findings, conclusions and orders submitted by the parties; and

(2) The decision and order by the Judicial Officer upon appeal of the Judge's decision.

*Hearing* means that part of the proceeding which involves the submission of evidence before the Judge for the record in the proceeding.

*Hearing Clerk* means the Hearing Clerk, United States Department of Agriculture, Washington, DC 20250.

*Judge* means any Administrative Law Judge appointed pursuant to 5 U.S.C. 3105 and assigned to the proceeding involved.

*Judicial Officer* means an official of the United States Department of Agriculture delegated authority by the Secretary of Agriculture, pursuant to the Act of April 4, 1940 (7 U.S.C. 450c–450g) and Reorganization Plan No. 2 of 1953 (5 U.S.C. App. (1988)), to perform the function involved (§ 2.35(a) of this chapter), or the Secretary of Agriculture if the authority so delegated is exercised by the Secretary.

*Mail* means to deposit an item in the United States Mail with postage affixed and addressed as necessary to cause it to be delivered to the address shown by ordinary mail, or by certified or registered mail if specified.

*Petitioner* means an individual who has filed a petition for review of a determination that the individual is responsibly connected to a licensee within the meaning of 7 U.S.C. 499a(b)(9).

*Re-mail* means to mail by ordinary mail to an address an item that has been returned after being sent to the same address by certified or registered mail.

*Respondent* means the party proceeded against.

[42 FR 743, Jan. 4, 1977, as amended at 55 FR 30673, July 27, 1990; 60 FR 8455, Feb. 14, 1995; 61 FR 11503, Mar. 21, 1996; 68 FR 6340, Feb. 7, 2003]

**§ 1.133  Institution of proceedings.**

(a) *Submission of information concerning apparent violations.* (1) Any interested person desiring to submit information regarding an apparent violation of any provision of a statute listed in § 1.131 or of any regulation, standard, instruction, or order issued pursuant thereto, may file the information with the Administrator of the agency administering the statute involved in accordance with this section and any applicable statutory or regulation provisions. Such information may be made the basis of any appropriate proceeding covered by the rules in this subpart, or any other appropriate proceeding authorized by the particular statute or the regulations promulgated thereunder.

(2) The information may be submitted by telegram, by letter, or by a preliminary statement of facts, setting forth the essential details of the transaction complained of. So far as practicable, the information shall include such of the following items as may be applicable:

(i) The name and address of each person and of the agent, if any, representing such person in the transaction involved;

(ii) Place where the alleged violation occurred;

(iii) Quantity and quality or grade of each kind of product or article involved;

(iv) Date of alleged violation;

(v) Car initial and number, if carlot;

(vi) Shipping and destination points;

(vii) If a sale, the date, sale price, and amount actually received;

(viii) If a consignment, the date, reported proceeds, gross, net;

(ix) Amount of damage claimed, if any;

(x) Statement of other material facts, including terms of contract; and

(xi) So far as practicable, true copies of all available papers relating to the transaction complained about, including shipping documents, letters, telegrams, invoices, manifests, inspection certificates, accounts of sales and any special contracts or agreements.

(3) Upon receipt of the information and supporting evidence, the Administrator shall cause such investigation to

39

and other documentary evidence at the hearing;

(5) Summon and examine witnesses and receive evidence at the hearing;

(6) Take or order the taking of depositions as authorized under these rules;

(7) Admit or exclude evidence;

(8) Hear oral argument on facts or law;

(9) Require each party to provide all other parties and the Judge with a copy of any exhibit that the party intends to introduce into evidence prior to any hearing to be conducted by telephone or audio-visual telecommunication;

(10) Require each party to provide all other parties with a copy of any document that the party intends to use to examine a deponent prior to any deposition to be conducted by telephone or audio-visual telecommunication;

(11) Require that any hearing to be conducted by telephone or audio-visual telecommunication be conducted at locations at which the parties and the Judge are able to transmit and receive documents during the hearing;

(12) Require that any deposition to be conducted by telephone or audio-visual telecommunication be conducted at locations at which the parties are able to transmit and receive documents during the deposition;

(13) Do all acts and take all measures necessary for the maintenance of order, including the exclusion of contumacious counsel or other persons; and

(14) Take all other actions authorized under these rules.

(d) *Who may act in the absence of the Judge.* In case of the absence of the Judge or the Judge's inability to act, the powers and duties to be performed by the Judge under these rules of practice in connection with any assigned proceeding may, without abatement of the proceeding unless otherwise directed by the Chief Judge, be assigned to any other Judge.

[42 FR 743, Jan. 4, 1977, as amended at 60 FR 8456, Feb. 14, 1995; 68 FR 6340, Feb. 7, 2003]

### § 1.145   Appeal to Judicial Officer.

(a) *Filing of petition.* Within 30 days after receiving service of the Judge's decision, if the decision is a written decision, or within 30 days after issuance of the Judge's decision, if the decision is an oral decision, a party who disagrees with the decision, any part of the decision, or any ruling by the Judge or who alleges any deprivation of rights, may appeal the decision to the Judicial Officer by filing an appeal petition with the Hearing Clerk. As provided in §1.141(h)(2), objections regarding evidence or a limitation regarding examination or cross-examination or other ruling made before the Judge may be relied upon in an appeal. Each issue set forth in the appeal petition and the arguments regarding each issue shall be separately numbered; shall be plainly and concisely stated; and shall contain detailed citations to the record, statutes, regulations, or authorities being relied upon in support of each argument. A brief may be filed in support of the appeal simultaneously with the appeal petition.

(b) *Response to appeal petition.* Within 20 days after the service of a copy of an appeal petition and any brief in support thereof, filed by a party to the proceeding, any other party may file with the Hearing Clerk a response in support of or in opposition to the appeal and in such response any relevant issue, not presented in the appeal petition, may be raised.

(c) *Transmittal of record.* Whenever an appeal of a Judge's decision is filed and a response thereto has been filed or time for filing a response has expired, the Hearing Clerk shall transmit to the Judicial Officer the record of the proceeding. Such record shall include: the pleadings; motions and requests filed and rulings thereon; the transcript or recording of the testimony taken at the hearing, together with the exhibits filed in connection therewith; any documents or papers filed in connection with a prehearing conference; such proposed findings of fact, conclusions, and orders, and briefs in support thereof, as may have been filed in connection with the proceeding; the Judge's decision; such exceptions, statements of objections and briefs in support thereof as may have been filed in the proceeding; and the appeal petition, and such briefs in support thereof and responses thereto as may have been filed in the proceeding.

**Office of the Secretary, USDA** **§ 1.146**

(d) *Oral argument.* A party bringing an appeal may request, within the prescribed time for filing such appeal, an opportunity for oral argument before the Judicial Officer. Within the time allowed for filing a response, appellee may file a request in writing for opportunity for such an oral argument. Failure to make such request in writing, within the prescribed time period, shall be deemed a waiver of oral argument. The Judicial Officer may grant, refuse, or limit any request for oral argument. Oral argument shall not be transcribed unless so ordered in advance by the Judicial Officer for good cause shown upon request of a party or upon the Judicial Officer's own motion.

(e) *Scope of argument.* Argument to be heard on appeal, whether oral or on brief, shall be limited to the issues raised in the appeal or in the response to the appeal, except that if the Judicial Officer determines that additional issues should be argued, the parties shall be given reasonable notice of such determination, so as to permit preparation of adequate arguments on all issues to be argued.

(f) *Notice of argument; postponement.* The Hearing Clerk shall advise all parties of the time and place at which oral argument will be heard. A request for postponement of the argument must be made by motion filed a reasonable amount of time in advance of the date fixed for argument.

(g) *Order of argument.* The appellant is entitled to open and conclude the argument.

(h) *Submission on briefs.* By agreement of the parties, an appeal may be submitted for decision on the briefs, but the Judicial Officer may direct that the appeal be argued orally.

(i) *Decision of the judicial officer on appeal.* As soon as practicable after the receipt of the record from the Hearing Clerk, or, in case oral argument was had, as soon as practicable thereafter, the Judicial Officer, upon the basis of and after due consideration of the record and any matter of which official notice is taken, shall rule on the appeal. If the Judicial Officer decides that no change or modification of the Judge's decision is warranted, the Judicial Officer may adopt the Judge's decision as the final order in the proceeding, preserving any right of the party bringing the appeal to seek judicial review of such decision in the proper forum. A final order issued by the Judicial Officer shall be filed with the Hearing Clerk. Such order may be regarded by the respondent as final for purposes of judicial review without filing a petition for rehearing, reargument, or reconsideration of the decision of the Judicial Officer.

[42 FR 743, Jan. 4, 1977, as amended at 60 FR 8456, Feb. 14, 1995; 68 FR 6341, Feb. 7, 2003]

§ 1.146 **Petitions for reopening hearing; for rehearing or reargument of proceeding; or for reconsideration of the decision of the Judicial Officer.**

(a) *Petition requisite*—(1) *Filing; service; ruling.* A petition for reopening the hearing to take further evidence, or for rehearing or reargument of the proceeding, or for reconsideration of the decision of the Judicial Officer, must be made by petition filed with the Hearing Clerk. Every such petition must state specifically the grounds relied upon. Any such petition filed prior to the filing of an appeal of the Judge's decision pursuant to §1.145 shall be ruled upon by the Judge, and any such petition filed thereafter shall be ruled upon by the Judicial Officer.

(2) *Petition to reopen hearing.* A petition to reopen a hearing to take further evidence may be filed at any time prior to the issuance of the decision of the Judicial Officer. Every such petition shall state briefly the nature and purpose of the evidence to be adduced, shall show that such evidence is not merely cumulative, and shall set forth a good reason why such evidence was not adduced at the hearing.

(3) *Petition to rehear or reargue proceeding, or to reconsider the decision of the Judicial Officer.* A petition to rehear or reargue the proceeding or to reconsider the decision of the Judicial Officer shall be filed within 10 days after the date of service of such decision upon the party filing the petition. Every petition must state specifically the matters claimed to have been erroneously decided and alleged errors must be briefly stated.

49

**Office of the Secretary, USDA**                                    **§ 2.15**

from a general officer, in this part, report to and are under the supervision of that general officer.

[60 FR 56393, Nov. 8, 1995, as amended at 83 FR 22179, May 14, 2018]

**§ 2.8  Delegations of authority to agency heads to order that the United States flag be flown at half-staff.**

Pursuant to section 5 of Proclamation 3044, 3 CFR, 1954–1958 Comp., p. 4, each general officer and agency head is delegated authority to order that the United States flag shall be flown at half-staff on buildings and grounds under his or her jurisdiction or control. This authority shall be exercised in accordance with directives promulgated by the Director, Office of Operations.

**§ 2.9  Additional delegations.**

The authority granted to a general officer may be exercised in the discharge of any additional functions which the Secretary may assign.

**§ 2.10  Limitations.**

The delegations made in this part shall not be construed to confer upon any general officer or agency head the authority of the Secretary to prescribe regulations which by law require approval of the President.

**§ 2.11  New principles and periodic reviews.**

In the exercise of authority delegated by the Secretary, the application of new principles of major importance or a departure from principles established by the Secretary should be brought to the attention of the Secretary. General officers are responsible for assuring that periodic reviews are conducted of the activities of the agencies assigned to their direction and supervision, as required by 5 U.S.C. 305.

**§ 2.12  Secretary and general officers not precluded from exercising delegated powers.**

No delegation of authority by the Secretary or a general officer contained in this part shall preclude the Secretary or general officer from exercising any of the authority so delegated.

**§ 2.13  Status of prior delegations.**

Nothing in this part shall affect the bylaws of the Commodity Credit Corporation, the Federal Crop Insurance Corporation, or the Rural Telephone Bank. All delegations previously made which are inconsistent with delegations made in this part are superseded; however, any regulation, order, authorization, expenditure, or other instrument, heretofore issued or made pursuant to any delegation of authority shall continue in full force and effect unless and until withdrawn or superseded pursuant to authority granted in this part.

## Subpart C—Delegations of Authority to the Deputy Secretary, Under Secretaries, and Assistant Secretaries

EDITORIAL NOTE: Nomenclature changes to subpart C of part 2 appear at 60 FR 66713, Dec. 26, 1995.

**§ 2.14  Deputy Secretary.**

The following delegation of authority is made by the Secretary of Agriculture to the Deputy Secretary: Perform all of the duties and exercise all of the powers and functions which are now or which may hereafter be, vested in the Secretary of Agriculture. This delegation is subject to the limitation in § 2.10.

[60 FR 56393, Nov. 8, 1995. Redesignated at 87 FR 44266, July 26, 2022]

**§ 2.15  Under Secretary for Trade and Foreign Agricultural Affairs.**

(a) The following delegations of authority are made by the Secretary of Agriculture to the Under Secretary for Trade and Foreign Agricultural Affairs:

(1) *Related to foreign agriculture.* (i) Coordinate the carrying out by Department agencies of their functions involving foreign agricultural policies and programs and their operations and activities in foreign areas. Act as liaison on these matters and functions relating to foreign agriculture between the Department of Agriculture and the Department of State, the United States Trade Representative, the Trade Policy

159

§ 2.26

(25) Carry out prize competition authorities in section 24 of the Stevenson-Wydler Technology Innovation Act of 1980 (15 U.S.C. 3719) related to functions otherwise delegated to the Assistant Secretary for Civil Rights, except for authorities delegated to the Chief Financial Officer in § 2.28(a)(29) and authorities reserved to the Secretary in paragraph (b)(1) of this section.

(26) As directed by section 12403(a) of the Agriculture Improvement Act of 2018, conduct civil rights impact analyses in accordance with Departmental Regulation 4300–004 issued on October 17, 2016, with respect to the Department's employment, federally conducted programs and activities, and federally assisted programs and activities.

(b) The following authorities are reserved to the Secretary of Agriculture:

(1) Approval of prize competitions that may result in the award of more than $1,000,000 in cash prizes under section 24(m)(4)(B) of the Stevenson-Wydler Technology Innovation Act of 1980 (15 U.S.C. 3719(m)(4)(B)).

(2) [Reserved]

[77 FR 14953, Mar. 14, 2012, as amended at 78 FR 40937, July 9, 2013; 79 FR 44109, July 30, 2014; 80 FR 58337, Sept. 29, 2015; 85 FR 65512, Oct. 15, 2020]

§ 2.26   Director, Office of the Executive Secretariat.

(a) *Delegations.* The following delegations of authority are made by the Secretary to the Director, Office of the Executive Secretariat:

(1) Exercise responsibility for all correspondence control and related records management functions for the Office of the Secretary;

(2) Provide administrative, editorial, and project management support services to the immediate Office of the Secretary.

(b) [Reserved]

[87 FR 44269, July 26, 2022]

## Subpart D—Delegations of Authority to Other General Officers and Agency Heads

EDITORIAL NOTE: Nomenclature changes to subpart D of part 2 appear at 60 FR 66713, Dec. 26, 1995.

7 CFR Subtitle A (1–1–25 Edition)

§ 2.27   Office of Administrative Law Judges.

(a) The following designations are made by the Secretary of Agriculture to the Office of Administrative Law Judges:

(1) Administrative law judges (formerly hearing examiners) are designated pursuant to 5 U.S.C. 556(b)(3) to hold hearings and perform related duties in proceedings subject to 5 U.S.C. 556 and 557, arising under the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601 *et seq.*); the Commodity Exchange Act as amended (7 U.S.C. 1 *et seq.*); the Perishable Agricultural Commodities Act, as amended (7 U.S.C. 499a *et seq.*); the Federal Seed Act, as amended (7 U.S.C. 1551 *et seq.*); the (Laboratory) Animal Welfare Act, as amended (7 U.S.C. 2131 *et seq.*); the Packers and Stockyards Act, 1921, as amended and supplemented (7 U.S.C. 181 *et seq.*); the Forest Resources Conservation and Shortage Relief of 1990 (16 U.S.C. 630 *et seq.*); and any other acts providing for hearings to which the provisions of 5 U.S.C. 556 and 557, are applicable. Pursuant to the applicable rules of practice, the administrative law judges shall make initial decisions in adjudication and rate proceedings subject to 5 U.S.C. 556 and 557. Such decisions shall become final without further proceedings unless there is an appeal to the Secretary by a party to the proceeding in accordance with the applicable rules of practice: Provided, however, that no decision shall be final for purposes of judicial review except a final decision of the Secretary upon appeal. As used herein, "Secretary" means the Secretary of Agriculture, the Judicial Officer, or other officer or employee of the Department delegated, pursuant to the Act of April 4, 1940 (7 U.S.C. 450c–450g), and Reorganization Plan No. 2 of 1953 (5 U.S.C. App.), "regulatory functions" as that term is defined in the 1940 Act, in acting as final deciding officer in adjudication and rate proceedings subject to 5 U.S.C. 556 and 557. Administrative Law Judges are delegated authority to hold hearings and perform related duties as provided in the Rules of Practice Governing Cease and Desist Proceedings Under Section 2 of the Capper-

232

**Office of the Secretary, USDA**                                    **§ 2.28**

Volstead Act, set forth in part 1, subpart I of this title.

(2) [Reserved]

(b) The Chief Administrative Law Judge is delegated the following administrative responsibilities subject to the guidance and control of the Assistant Secretary for Administration (*See* § 2.24(a)(12)):

(1) Exercise general responsibility and authority for all matters related to the administrative activities of the Office of Administrative Law Judges; and

(2) Direct the functions of the Hearing Clerk as set out in § 2.24(a)(12)(iii).

[60 FR 56393, Nov. 8, 1995, as amended at 75 FR 43380, July 23, 2010]

### § 2.28  Chief Financial Officer.

(a) The Chief Financial Officer, under the supervision of the Secretary of Agriculture, is responsible for executing the duties enumerated for agency Chief Financial Officers in the Chief Financial Officers Act of 1990, Public Law 101–576, 31 U.S.C. 902, and additional specified duties, including:

(1) Report directly to the Secretary regarding financial management matters.

(2) Oversee all financial management activities relating to the programs and operations of the Department and component agencies.

(3) Develop and maintain an integrated accounting and financial system for the Department and component agencies, including financial reporting and internal controls, which—

(i) Complies with applicable accounting principles, standards, and requirements, and internal control standards;

(ii) Complies with such policies and requirements as may be prescribed by the Director of the Office of Management and Budget (OMB);

(iii) Complies with any other requirements applicable to such systems; and

(iv) Provides for complete, reliable, consistent, and timely information which is prepared on a uniform basis and which is responsive to the financial information needs of Department management and for the development and reporting of cost information, the integration of accounting and budgeting information, and the systematic measurement of performance.

(4) Make recommendations to the Secretary regarding the selection of the Deputy Chief Financial Officer of the Department, and selection of principal financial officers of component agencies of the Department.

(5) Direct, manage, and provide policy guidance and oversight of Department financial management personnel, activities, and operations, including:

(i) Prepare and annually revise a Departmental plan to:

(A) Implement the 5-year financial management plan prepared by the Director of OMB under 31 U.S.C. 3512(a)(3); and

(B) Comply with the requirements established for agency financial statements under 31 U.S.C. 3515 and with the requirements for audits of Department financial statements established in 31 U.S.C. 3521(e) and (f).

(ii) Develop Departmental financial management budgets, including the oversight and recommendation of approval of component agency financial management budgets.

(iii) Recruit, select, and train personnel to carry out Departmental financial management functions.

(iv) Approve and manage Departmental, and approve component agency, financial management systems design or enhancement projects.

(v) Implement and approve Departmental, and approve component agency, asset management systems, including systems for cash management, credit management, debt collection, and property and inventory management and control.

(6) Prepare and transmit, by not later than 60 days after the submission of the audit report required by 31 U.S.C. 3521(f), an annual report to the Secretary and the Director of OMB, which shall include:

(i) A description and analysis of the status of financial management of the Department.

(ii) The annual financial statements prepared under 31 U.S.C. 3521.

(iii) The audit report transmitted to the Secretary under 31 U.S.C. 3521.

(iv) A summary of the reports on internal accounting and administrative control systems submitted to the President and the Congress under the

233

**Office of the Secretary, USDA**                    **§ 2.35**

U.S.C. 552a; and provide consultation and guidance regarding those policies.

(14) Administer the Controlled Unclassified Information (CUI) Program for the Department pursuant to E.O. 13556, ''Controlled Unclassified Information'' (75 FR 68675, 3 CFR, 2011 Comp., p. 267) and 32 CFR part 2002.

(b) [Reserved]

[85 FR 65512, Oct. 15, 2020, as amended at 88 FR 70580, Oct. 12, 2023]

**§ 2.33  Inspector General.**

(a) The following delegations of authority are made by the Secretary of Agriculture to the Inspector General:

(1) Advise the Secretary and General officers in the planning, development, and execution of Department policies and programs.

(2) At the request of the Director, Homeland Security Staff (Director), determine the availability of law enforcement personnel of the Office of Inspector General to assist the Director in providing for the personal security for the Secretary and the Deputy Secretary.

(3) Serve as liaison official for the Department for all audits of USDA performed by the General Accounting Office.

(4) In addition to the above delegations of authority, the Inspector General, under the general supervision of the Secretary, has specific duties, responsibilities, and authorities pursuant to the Inspector General Act of 1978, Pub. L. No. 95–452, 5 U.S.C. App.

(b) The following authority is reserved to the Secretary of Agriculture: Approving the implementation in the Office of Inspector General of administrative policies or procedures that contravene standard USDA administrative policies as promulgated by the Assistant Secretary for Administration.

[60 FR 56393, Nov. 8, 1995, as amended at 72 FR 36859, July 6, 2007]

**§ 2.34  Director, National Appeals Division.**

The Director, National Appeals Division, under the general supervision of the Secretary or Deputy Secretary, has specific duties, responsibilities, and authorities pursuant to subtitle H of the Department of Agriculture Reorganization Act of 1994, Public Law 103–354 (7 U.S.C. 6991 *et seq.*), including:

(a) Deciding appeals from adverse decisions, made by an officer or employee of an agency of the Department designated by the Secretary, that are adverse to participants. The term ''agency'' shall include the following and any predecessor agency: the Farm Service Agency; the Commodity Credit Corporation (with respect to domestic programs); the Federal Crop Insurance Corporation; the Rural Housing Service; the Rural Business-Cooperative Service; the Natural Resources Conservation Service; and a State, county, or area committee established under section 8(b)(5) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h(b)(5)); and

(b) The authority to appoint such hearing officers and other employees as are necessary for the administration of the activities of the Division.

(c) Prepare a report each year on the number of requests for equitable relief and the disposition of such requests for inclusion in the report of the Secretary to Congress on equitable relief requests made to the Department under farm and conservation programs (7 U.S.C. 7996(g)(2).

[60 FR 56393, Nov. 8, 1995, as amended at 68 FR 27442, May 20, 2003; 79 FR 44112, July 30, 2014]

**§ 2.35  Judicial Officer.**

(a) Pursuant to the Act of April 4, 1940, as amended (7 U.S.C. 450c–450g), and Reorganization Plan No. 2 of 1953 (5 U.S.C. app.), the Secretary of Agriculture makes the following delegations of authority to the Judicial Officer. The Judicial Officer is authorized to:

(1) Act as final deciding officer in adjudicatory proceedings subject to 5 U.S.C. 556 and 557;

(2) Act as final deciding officer in adjudicatory proceedings which are or may be subject to the ''Rules of Practice Governing Formal Adjudicatory Proceedings Instituted by the Secretary Under Various Statutes'' set forth in part 1, subpart H, of this title;

(3) Act as final deciding officer in adjudicatory proceedings which are or

245

may be subject to the "Rules of Practice Governing Cease and Desist Proceedings Under Section 2 of the Capper-Volstead Act" set forth in part 1, subpart I, of this title;

(4) Act as final deciding officer in adjudicatory proceedings subject to the "Procedures Related to Administrative Hearings Under the Program Fraud Civil Remedies Act of 1986" set forth in part 1, subpart L, of this title;

(5) Act as final deciding officer in adjudicatory proceedings subject to the "Rules of Practice Governing Adjudication of Sourcing Area Applications and Formal Review of Sourcing Areas Pursuant to the Forest Resources Conservation and Shortage Relief Act of 1990 (16 U.S.C. 620, *et seq.*)" set forth in part 1, subpart M, of this title;

(6) Act as final deciding officer in rate proceedings under the Packers and Stockyards Act, as amended and supplemented (7 U.S.C. 181–229);

(7) Act as final deciding officer in reparation proceedings under statutes administered by the United States Department of Agriculture;

(8) Act as final deciding officer in appeals under section 63 of the Plant Variety Protection Act (7 U.S.C. 2443), and in reexamination proceedings under section 91 of the Plant Variety Protection Act, as amended (7 U.S.C. 2501);

(9) Act as final deciding officer in adjudicatory proceedings under section 359i of the Agricultural Adjustment Act of 1938, as amended (7 U.S.C. 1359ii);

(10) Issue rules of practice applicable to proceedings conducted under section 359i of the Agricultural Adjustment Act of 1938, as amended (7 U.S.C. 1359ii);

(11) Act as final deciding officer in adjudicatory proceedings subject to the "Rules of Practice Governing Proceedings on Petitions To Modify or To Be Exempted From Marketing Orders" set forth in sections 900.50 through 900.71 of this title;

(12) Act as final deciding officer in adjudicatory proceedings subject to the "Rules of Practice Governing Proceedings on Petitions to Modify or To Be Exempted from Research, Promotion, and Information Programs"

set forth in part 1200, subpart B, of this title; and

(13) Act as final deciding officer in adjudicatory proceedings subject to "Appeals of Quality Control ('QC') Claims" set forth in part 283 of this title.

(b) The delegation of authority from the Secretary of Agriculture to the Judicial Officer in paragraph (a) of this section shall not be construed to limit the authority of the Judicial Officer to perform any functions, in addition to those identified in the Act of April 4, 1940, as amended (7 U.S.C. 450c–450g), which may be assigned by the Secretary of Agriculture to the Judicial Officer.

(c) As used in this section, the term *Judicial Officer* shall mean any person or persons so designated by the Secretary of Agriculture.

[68 FR 27443, May 20, 2003, as amended at 75 FR 43380, July 23, 2010]

§ 2.36 Director, Office of Communications.

(a) *Delegations.* The following delegations of authority are made by the Secretary of Agriculture to Director, Office of Communications:

(1) *Related to public affairs.* (i) Advise and counsel general officers on public affairs matters to the Department.

(ii) Organize and direct the activities of a public affairs office to include press relations of the secretary of agriculture and other executive functions and services for general officers of the Department.

(2) *Related to information activities.* (i) Advise the secretary and general officers in the planning, development, and execution of Department policies and programs.

(ii) Direct and coordinate the overall formulation and development of policies, programs, plans, procedures, standards and organization structures and staffing patterns for the information activities of the Department and its agencies, both in Washington and in the field.

(iii) Exercise final review and approval of all public information material prepared by the Department and its agencies and select the most effective method and audience for distributing this information.