## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOE MANIS,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE
ROLLINS, in her official capacity as the Secretary of Agriculture; MICHAEL
WATSON, in his official capacity as Administrator of the Animal & Plant
Health Inspection Service,

Defendant-Appellees.

On Appeal from the United States District Court for the
Middle District of North Carolina

## BRIEF FOR APPELLEES

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
DANIEL AGUILAR
DAVID L. PETERS
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-6735*
  *david.l.peters@usdoj.gov*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION .................................................................. 3

STATEMENT OF THE ISSUES........................................................................ 3

STATEMENT OF THE CASE............................................................................ 3

    A.    Legal Background ................................................................. 3

    B.    Prior Proceedings ................................................................. 8

SUMMARY OF ARGUMENT .........................................................................12

STANDARD OF REVIEW ...............................................................................15

ARGUMENT .....................................................................................................15

I.     Congress Constitutionally Authorized The Secretary To Adjudicate Violations Of The Horse Protection Act.............................................15

II.    The Judicial Officer Is An Inferior Officer Constitutionally Appointed By The Secretary .................................................................29

    A.    The Judicial Officer Is an Inferior Officer Subject to At-Will Removal and Supervision by the Secretary .............................30

    B.    The Secretary May Properly Appoint the Judicial Officer........ 45

CONCLUSION ................................................................................ 49

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n:*
518 F.2d 990 (5th Cir. 1975) ............................................... 22
430 U.S. 442 (1977) ........................................................ 21, 22

*Axalta Coating Sys. LLC v. FAA,*
144 F.4th 467 (3d Cir. 2025) .............................. 22-23, 23, 24

*Bakelite Corp., Ex parte,*
279 U.S. 438 (1929) ........................................................ 18

*Biggs v. North Carolina Dep't of Pub. Safety,*
953 F.3d 236 (4th Cir. 2020) .............................................. 49

*Bowsher v. Synar,*
478 U.S. 714 (1986) ........................................................ 31

*Burnap v. United States,*
252 U.S. 512 (1920) ........................................................ 47

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ........................................................ 16

*Crowell v. Benson,*
285 U.S. 22 (1932) ................................................. 16, 17, 21

*Duenas v. Garland,*
78 F.4th 1069 (9th Cir. 2023) ...................................... 15, 45

*Edmond v. United States,*
520 U.S. 651 (1997) ....................... 13-14, 14, 30, 31, 33, 34, 46

*Evaluation Rsch. Corp. v. Alequin,*
439 S.E.2d 387 (Va. 1994) ............................................... 27

*Fleming v. U.S. Dep't of Agric.,*
987 F.3d 1093 (D.C. Cir. 2021) ..................................... 39, 42

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ........................................................ 34

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33 (1989) ........................................................................ 21, 24

*Grise v. State,*
37 Ark. 456 (1881) ............................................................................. 20

*Husky Int'l Elecs., Inc. v. Ritz,*
578 U.S. 355 (2016) ........................................................................... 27

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
684 F.3d 1332 (D.C. Cir. 2012) ......................................................... 39

*Kennedy v. Braidwood Mgmt., Inc.,*
606 U.S. 748 (2025) ...... 3, 10, 11, 14, 30, 31, 32, 33, 35, 38, 40, 41, 43, 48

*Lucia v. SEC,*
585 U.S. 237 (2018) ...................................................................... 30, 47

*Manis v. U.S. Dep't of Agric.,*
2025 WL 2389422 (4th Cir. Aug. 21, 2025) ................................. 5-6, 6, 9

*NLRB v. SW Gen., Inc.,*
580 U.S. 288 (2017) ...........................................................................48

*Oceanic Steam Navigation Co. v. Stranahan,*
214 U.S. 320 (1909) ........................................................................... 24

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*
584 U.S. 325 (2018) ............................................................... 13, 16, 17

*Palo Alto Networks, Inc., In re,*
44 F.4th 1369 (Fed. Cir. 2022) ............................................. 33, 37, 39, 43

*People v. Brunell,*
48 How. Pr. 435 (N.Y. Gen. Sess. 1874) ......................................... 20, 26

*Rodriguez v. Social Sec. Admin.,*
118 F.4th 1302 (11th Cir. 2024) ......................... 15, 33, 37, 38, 39, 43, 45

*Roe v. Marshall Univ. Bd. of Governors,*
145 F.4th 561 (4th Cir. 2025) ............................................................. 15

*Seabrook v. Driscoll,*
148 F.4th 264 (4th Cir. 2025) ............................................................. 15

*SEC v. Jarkesy,*
603 U.S. 109 (2024) ................... 2, 11, 17, 18, 19, 21, 22, 24, 25, 26, 28, 29

*Stamper v. Secretary of Agric.,*
722 F.2d 1483 (9th Cir. 1984) ............................................. 6, 7

*State v. Beekman,*
27 N.J.L. 124 (Sup. Ct. 1858) ............................................. 20

*State v. Bruner,*
12 N.E. 103 (Ind. 1887) ............................................. 20

*Stern v. Marshall,*
564 U.S. 462 (2011) ............................................. 2, 16

*Thornton v. U.S. Dep't of Agric.,*
715 F.2d 1508 (11th Cir. 1983) ............................................. 7

*United States v. Arthrex,*
594 U.S. 1 (2021) ............................................. 32, 33, 35, 36

*United States v. Mitchell,*
39 F.3d 465 (4th Cir. 1994) ............................................. 46

*Utica Packing Co. v. Block,*
781 F.2d 71 (6th Cir. 1986) ............................................. 44

*Varnadore v. Secretary of Lab.,*
141 F.3d 625 (6th Cir. 1998) ............................................. 45

*Willy v. Administrative Rev. Bd.,*
423 F.3d 483 (5th Cir. 2005) ............................................. 45

*Withrow v. Larkin,*
421 U.S. 35 (1975) ............................................. 43

**U.S. Constitution:**

Art. II, § 2, cl. 2 ............................................. 2, 29, 45-46

Amend. VII ............................................. 24

**Statutes:**

Act of Apr. 4, 1940,
ch. 75, § 2, 54 Stat. 81, 81
(codified at 7 U.S.C. §§ 2204-2, 2204-3) ................................................48

Administrative Procedure Act,
5 U.S.C. § 554(d)(C) ...................................................... 43

Horse Protection Act:
15 U.S.C. § 1821(3) ............................................................. 1
15 U.S.C. § 1822(1) ........................................... 1, 5, 12, 19
15 U.S.C. § 1822(2) ...................................................... 27
15 U.S.C. § 1824 ...................................................... 13, 27
15 U.S.C. § 1824(2) ....................................................... 7
15 U.S.C. § 1825 ............................................................ 13
15 U.S.C. § 1825(a) (1970) ....................................... 22
15 U.S.C. § 1825(a)(1) .................................................. 7
15 U.S.C. § 1825(b) ..................................................... 39
15 U.S.C. § 1825(b)(1) .................................................. 7
15 U.S.C. § 1825(b)(2) ............................................... 1, 8
15 U.S.C. § 1825(b)(3) ............................................. 8, 29
15 U.S.C. § 1825(b)(4) ................................................ 43
15 U.S.C. § 1825(c) ................................................. 7, 29
15 U.S.C. § 1828 ....................................................... 40

5 U.S.C. § 3105 ....................................................... 47

5 U.S.C. § 7513(a) ..................................................... 36

7 U.S.C. § 2201 ........................................................... 4

7 U.S.C. § 2202 ........................................................... 4

7 U.S.C. § 2204 ........................................................... 4

7 U.S.C. § 2204-2 ...................................... 4, 10, 14, 39, 41, 46

7 U.S.C. § 2204-3 .................................................. 4, 42

7 U.S.C. § 6912(a)(1) ................................................ 48

10 U.S.C. § 867(a) ..................................................... 34

10 U.S.C. § 867(c) ..................................................... 34

28 U.S.C. § 1291 ........................................................ 3

28 U.S.C. § 1331 ........................................................ 3

35 U.S.C. § 6(c) ...................................................... 36

50 U.S.C. § 4819(c) ................................................ 26

**Regulations:**

7 C.F.R. § 1.45 ......................................................... 5

7 C.F.R. § 1.131 ....................................................... 7

7 C.F.R. § 1.132 ........................................... 5, 7, 39, 42

7 C.F.R. § 1.133(b)(1) ............................................. 7

7 C.F.R. §§ 1.141-1.142 ........................................... 7

7 C.F.R. § 1.145 ....................................................... 8

7 C.F.R. § 1.146 ....................................................... 8

7 C.F.R. § 2.11 ...................................................... 40

7 C.F.R. § 2.12 ............................................... 5, 39, 42

7 C.F.R. § 2.35 ........................................... 4, 5, 15, 47

7 C.F.R. § 2.35(a) ................................................. 39

9 C.F.R. pt. 11 ..................................................... 28

9 C.F.R. §§ 11.1-11.41 ..........................................40

20 C.F.R. § 404.972 .............................................. 37

60 Fed. Reg. 8,446 (Feb. 14, 1995) ...................... 4, 40

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ...................................... 3

**Legislative Materials:**

H.R. Rep. No. 91-1597 (1970)......................................................7, 13, 18, 19

**Other Authorities:**

*Apex Meat Co., In re*,
47 Agric. Dec. 557, 1988 WL 242869 (U.S.D.A. Mar. 4, 1988) .............. 39

2 William Blackstone, Commentaries on the Laws of
England (1766)..................................................................................20

W. Ron DeHaven, *The Horse Protection Act – A Case
Study in Industry Self-Regulation*,
216 J. Am. Veterinary Med. Ass'n 1250 (Apr. 15, 2000) .......................... 6

*Harold J. Krent, Presidential Control of Adjudication
Within the Executive Branch*,
65 Case W. Res. L. Rev. 1083 (2015) .................................................... 16

USDA, *About the Judicial Officer*, https://perma.cc/9PD7-83C4 .............. 5

USDA, *John Walk Sworn In as Inspector General for
the United States Department of Agriculture Office
of Inspector General*, https://perma.cc/5KVN-2Q5Q .......................... 5

# INTRODUCTION

More than 50 years ago, Congress enacted the Horse Protection Act to protect horses from the "cruel and inhumane" practice of "soring," 15 U.S.C. § 1822(1), which causes them to "suffer[] physical pain or distress, inflammation, or lameness," *id.* § 1821(3). To stamp out this abusive practice, Congress made it unlawful to show or exhibit a horse that is sored, and it imposed penalties for violations of that prohibition. Congress vested responsibility for enforcing these provisions in the U.S. Department of Agriculture. The Secretary of Agriculture may initiate enforcement actions that are adjudicated in the first instance by an administrative law judge and that can be later reviewed by the Secretary or her delegee, the Judicial Officer. Any person who is found to have violated the Act and is assessed a civil penalty can seek judicial review. *Id.* § 1825(b)(2).

This case arises from an enforcement action to determine whether plaintiff violated the statute by showing a horse that was sored. Plaintiff sued in district court to enjoin the proceeding, arguing that the enforcement action suffered from constitutional deficiencies. The district court rejected plaintiff's arguments and entered judgment for the Secretary. This Court should affirm.

Plaintiff challenges Congress's authority to direct the Executive Branch to adjudicate violations of the Horse Protection Act. The Constitution requires that Article III courts adjudicate matters of private rights—*i.e.*, "the liability of one individual to another" concerning "traditional actions at common law tried by the courts at Westminster in 1789." *Stern v. Marshall*, 564 U.S. 462, 484, 489 (2011) (quotation marks omitted). But matters concerning public rights—claims "unknown to the common law"—can be properly assigned to adjudication within the Executive Branch. *SEC v. Jarkesy*, 603 U.S. 109, 137 (2024) (quotation marks omitted). Because the Horse Protection Act is a "self-consciously novel" statutory scheme that does not mirror any existing common law claim between private parties, *id.*, Congress can constitutionally assign to the Secretary the authority to adjudicate such matters.

Plaintiff also challenges the authority of the Department's Judicial Officer to decide cases like his, arguing that the Judicial Officer must be appointed by the President with Senate confirmation. The district court correctly rejected that argument because the Judicial Officer is an inferior officer properly appointed and supervised by the Secretary. U.S. Const. art. II, § 2, cl. 2. The Secretary serves as the Judicial Officer's superior because the Secretary can remove the officer at will, establish binding rules that the

2

officer must follow, and can control which matters she chooses to delegate to the officer.  Given these "multiple and mutually reinforcing means by which the Secretary ... can supervise and direct," the Judicial Officer properly serves as an inferior officer appointed by the Secretary.  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 768 (2025).

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331.  JA10.  On August 19, 2025, the district court entered final judgment against plaintiff, JA297, and plaintiff filed a notice of appeal six days later, JA298.  *See* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**1.**  Whether Congress constitutionally directed the Secretary to adjudicate violations of the Horse Protection Act.

**2.**  Whether the Department's Judicial Officer is properly appointed as an inferior officer under the Constitution's Appointments Clause.

## STATEMENT OF THE CASE

### A.    Legal Background

**1.**  Congress established the U.S. Department of Agriculture (the Department) as an "executive department, under the supervision and control of a Secretary of Agriculture, who shall be appointed by the

President, by and with the advice and consent of the Senate." 7 U.S.C. § 2202; *see also id.* § 2201. The Department's regulatory functions are vested in the Secretary. *See id.* §§ 2202, 2204. But whenever the Secretary "deems that the delegation of the whole or any part of any regulatory function … will result in the more expeditious discharge of the [Department's] duties," the Secretary "is authorized to make such delegation to any officer or employee designated under this section." *Id.* § 220 -2. Congress further authorized the Secretary "to designate officers or employees of the Department to whom functions may be delegated … and to assign appropriate titles to such officers or employees." *Id.* The Secretary "may at any time revoke the whole or any part of a delegation or designation," *id.*, but any such revocation "shall not be retroactive," *id.* § 2204-3.

Pursuant to that authority, the Secretary established the office of the Judicial Officer to exercise the Secretary's delegated authority to act as the decisionmaker in adjudicative proceedings under certain statutes. *See* 7 C.F.R. § 2.35. The scope of the Judicial Officer's adjudicative authority is set out in regulations promulgated by the Secretary. *See* 60 Fed. Reg. 8,446 (Feb. 14, 1995). The regulations govern, among other things, what proceedings the Judicial Officer may adjudicate and the adjudicative

procedures the Judicial Officer must follow when doing so.  *See* 7 C.F.R. §§ 1.45, 2.35.  The regulations also make clear that "[n]o delegation of authority by the Secretary" to the Judicial Officer precludes the Secretary "from exercising any of the authority so delegated."  *Id.* § 2.12; *see also* § 1.132 (defining "Judicial Officer" as an official "delegated authority by the Secretary of Agriculture … or the Secretary of Agriculture if the authority so delegated is exercised by the Secretary").

At the initiation of this litigation, the Judicial Officer was John Walk, appointed in 2020 by Secretary Sonny Perdue.  *See* USDA, *About the Judicial Officer*, https://perma.cc/9PD7-83C4.  On December 18, 2025, Walk was confirmed as the Department's Inspector General.  *See* USDA, *John Walk Sworn In as Inspector General for the United States Department of Agriculture Office of Inspector General*, https://perma.cc/5KVN-2Q5Q.  At the time of this filing, the role of the Judicial Officer remains vacant.

**2.**  This case concerns the Secretary's authority under the 1970 Horse Protection Act, which Congress enacted to address the "cruel and inhumane" treatment of horses—particularly, Tennessee Walking Horses. 15 U.S.C. § 1822(1).  Such horses "are known for their distinctive, smooth gaits."  *Manis v. U.S. Dep't of Agric.*, 2025 WL 2389422, at *1 (4th Cir. Aug.

21, 2025) (per curiam).  The "high-stepping gait or 'walk'" is "achieved through selective breeding and training."  *Stamper v. Secretary of Agric.*, 722 F.2d 1483, 1484 (9th Cir. 1984).  "These horses are entered into horse shows and competitions," in which the horses are judged on their distinctive walk.  *Manis*, 2025 WL 2389422, at *1.

"Unfortunately, the distinctive gaits can also be replicated through abuse of the horse."  *Manis*, 2025 WL 2389422, at *1.  "Making the forelimbs of the horse 'sore' by inflicting pain requires the horse to quickly lift its feet when it walks, which mimics the desired gait."  *Id*.  Soring can "be produced by use of nails, tacks, injections, [and] blistering agents," which are "cruel to the animal and threaten the Walking Horse industry and the breed itself, because winning horses are highly valued as studs."  *Stamper*, 722 F.2d at 1484.

The State of Tennessee "enacted a law against soring in 1957," but "[p]ublic outcry continued regarding the inhumanity of soring horses and its destructive effect on the horse industry."  W. Ron DeHaven, *The Horse Protection Act – A Case Study in Industry Self-Regulation*, 216 J. Am. Veterinary Med. Ass'n 1250, 1250 (Apr. 15, 2000) (quotation marks omitted).  Congress therefore enacted the Horse Protection Act "[t]o end

this cruelty and to protect the breed's natural ability to 'walk' in its distinctive fashion." *Stamper*, 722 F.2d at 1484.

The Horse Protection Act "was intended to 'make it impossible for persons to show sored horses.'" *Thornton v. U.S. Dep't of Agric.*, 715 F.2d 1508, 1511 (11th Cir. 1983) (quoting H.R. Rep. No. 91-1597, at 3 (1970)). The Act prohibits showing or exhibiting a sore horse in any horse show or exhibition, and also prohibits entering a sore horse in such an event in order to show or exhibit the horse. 15 U.S.C. § 1824(2). A person who knowingly violates that statutory provision may face criminal fines and imprisonment. *Id.* § 1825(a)(1). Any statutory violation established after "notice and opportunity for a hearing before" the Secretary is also subject to a civil penalty. *Id.* § 1825(b)(1). The Secretary may further order violators to be disqualified from participating in horse shows and exhibitions for a period of years. *Id.* § 1825(c).

If the Department has reason to believe that a person has violated the Horse Protection Act, it may institute an administrative proceeding by filing a complaint pursuant to the agency's hearing process. 7 C.F.R. § 1.133(b)(1); *see also id.* § 1.131. The matter is assigned to an administrative law judge (ALJ) who holds a hearing and issues an initial decision. *Id.* §§ 1.141-1.142; *see also* § 1.132 (defining "Judge" as used in

Department regulations to mean an ALJ). Any party who disagrees with the ALJ's decision may appeal to the Judicial Officer, who receives the parties' briefs, may hold oral argument, and issues a decision on behalf of the Secretary. *Id.* § 1.145. A party dissatisfied with the Judicial Officer's decision may file a petition for rehearing, reargument, or reconsideration. *Id.* § 1.146.

Aggrieved parties can also seek judicial review in the court of appeals. 15 U.S.C. § 1825(b)(2). If a party fails to pay a civil penalty after a final order by the Secretary, the United States may bring a collection suit in district court. *Id.* § 1825(b)(3). In that collection action, the "validity and appropriateness of the final order … shall not be subject to review." *Id.*

## B. Prior Proceedings

**1.** Plaintiff Joe Manis owns and regularly shows walking horses. JA238. In 2023, the Department initiated an enforcement action against Manis, alleging that he "allowed the entry of a horse he owned" in a Virginia horse show "while the horse was sore, in violation of 15 U.S.C. § 1824(2)(D)." JA41. The matter was assigned to adjudication before an ALJ.

Manis brought this suit in district court to enjoin that proceeding. JA9. Manis argued that (1) the Department's Judicial Officer was not

8

properly appointed by the President and confirmed by the Senate under the Constitution's Appointments Clause, and (2) any violation of the Horse Protection Act must be tried in an Article III court with a jury as factfinder. JA9-10.[1] The district court denied Manis's request for a preliminary injunction, concluding that Manis was unlikely to prevail on the merits of his constitutional challenges. JA91. Manis appealed that denial of a preliminary injunction, JA113, and this Court affirmed, holding that Manis "fail[ed] to demonstrate irreparable harm," *Manis*, 2025 WL 2389422, at *5.

**2.** While Manis's interlocutory appeal was pending, the ALJ issued an initial decision in the administrative enforcement action. *See* JA208. The ALJ concluded that "the Horse Protection Act was violated" when a horse owned by Manis was entered into "a horse show" while the horse "was sore within the meaning of the [Act]." JA208. The ALJ imposed a $10 civil penalty and a one-year industry wide disqualification. JA218. Manis appealed the ALJ's decision to the Department's then-serving Judicial Officer, who stayed the matter pending resolution of this litigation. JA221.

---

[1] Manis also challenged the removal restrictions applicable to the Department's ALJs, JA9, but he is no longer pursuing that claim on appeal. Opening Br. 3 n.1.

**3.** Following this Court's ruling on Manis's interlocutory appeal, the district court issued its decision on the parties' cross-dispositive motions, granting the government's motion in full and dismissing Manis's claims. JA233.

The district court concluded that the Judicial Officer served as an inferior officer and was properly appointed by the Secretary, the head of an executive department. The court explained that the Judicial Officer is an inferior officer constitutionally subordinate to the Secretary because the Secretary "has the power to both remove the Judicial Officer at will" and to exercise "supervision and direction" over the Judicial Officer. JA251. The court explained that "the Secretary need not review every decision" the Judicial Officer issues, JA253 (quoting *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 767 (2025)), and that the Secretary has "an arsenal of 'complementary review authorities,' which provide [her] the 'discretion to review decisions rendered' by the inferior officer," JA255 (emphasis omitted) (quoting *Braidwood*, 606 U.S. at 767).

The district court further concluded that the Secretary had properly appointed the Judicial Officer. Congress authorized the Secretary to "designate officers or employees of the Department to whom functions may be delegated," JA266 (quoting 7 U.S.C. § 2204-2), and the Supreme Court

has recognized that the statutory authority to "designate" an officer confers authority to appoint an officer for that purpose, JA273 (emphasis omitted) (quoting *Braidwood*, 606 U.S. at 780).

The district court likewise concluded that Congress could constitutionally assign the adjudication to the Executive Branch in the first instance, rather than an Article III court. The Horse Protection Act, the court explained, concerns public rights that can be adjudicated by the Executive Branch because it is "a cause of action that brings with it 'no common law soil.'" JA290 (quoting *SEC v. Jarkesy*, 603 U.S. 109, 137 (2024)). The Act "regulate[s] the abuse of horses," which the court observed was "a concern foreign to the common law ethos, which saw domestic animals, such as horses, as the 'absolute' property of man." JA294. The court rejected Manis's argument that the enforcement action resembled common law fraud or contract actions. The court explained that the Act "does not use common law fraud terms of art," and neither the Secretary nor reviewing courts "invok[ed] common law fraud principles to interpret and apply" the Act. JA292. And the court found Manis's analogy to a contract action "unpersuasive"—the Act prohibits soring horses and does not concern "a legally enforceable obligation between the defendant

and plaintiff, breached by defendant, which proximately caused damages."
JA293 (quotation marks omitted).

## SUMMARY OF ARGUMENT

Congress enacted the Horse Protection Act to address the "cruel and inhumane" practice of "soring" horses. 15 U.S.C. § 1822(1). Congress made it unlawful to show or exhibit sored horses, and it established penalties for violations, including money penalties that may be imposed through enforcement actions. The Secretary may delegate her authority to adjudicate Horse Protection Act violations to the Judicial Officer—an inferior officer who is removable by the Secretary and subject to her supervision. That adjudication structure is constitutional, and the district court thus rightly rejected Manis's challenges to it.

**I.** Congress constitutionally directed the Secretary to adjudicate violations of the Horse Protection Act. Since the Founding, Congress has authorized executive officials to conduct adjudications. In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between public and private rights. Although the Supreme Court has never definitively identified the distinguishing features of public rights, its "precedents have recognized that the [public-rights] doctrine covers matters which arise between the Government and persons subject to

its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (quotation marks omitted).

The Horse Protection Act concerns public rights, not private ones. Congress enacted the statute to "make it impossible for persons to show sored horses" by "making unlawful the showing or exhibition of sored horses and imposing penalties for violations." H.R. Rep. No. 91-1597, at 3 (1970); *see* 15 U.S.C. §§ 1824, 1825. In both conception and execution the Act was a deliberately novel departure from the existing common law, which did not concern itself with the abusive treatment of animals addressed by the Act. Violations of the Act are not traceable to the breach of contract or a duty in tort, nor does the United States seek to step into the shoes of any aggrieved private party. Instead, the adjudication seeks to determine whether Manis violated the Horse Protection Act's novel statutory prohibition on showing sored horses.

**II.** The Judicial Officer is an inferior officer properly appointed by the Secretary of Agriculture. The Supreme Court has long held that an officer is "inferior" under the Appointments Clause if the officer's "work is directed and supervised at some level by" a principal officer. *Edmond v.*

*United States*, 520 U.S. 651, 663 (1997).  That standard is easily satisfied here.  The Secretary exercises at-will removal authority over the Judicial Officer, which the Supreme Court has long recognized is a "a powerful tool for control."  *Id.* at 664.  The statutory scheme also grants the Secretary multiple reinforcing mechanisms to supervise the Judicial Officer's exercise of delegated authority.  The Secretary may revoke her delegation of authority to the Judicial Officer at any time, or can simply choose to exercise that authority herself, including when the role of Judicial Officer is vacant.  The Secretary also promulgates procedural and substantive regulations that the Judicial Officer must follow and has various means to review certain decisions of the Judicial Officer.  Taken together, these "multiple and mutually reinforcing means" of supervision mean that the Judicial Officer is an "inferior officer[]" under the Appointments Clause. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 768 (2025).

The Secretary's appointment of the Judicial Officer is also proper. Here, Congress authorized the Secretary to "designate officers" to exercise delegated authority on behalf of the Secretary, 7 U.S.C. § 2204-2, and the Supreme Court has held that materially identical statutes grant authority to appoint inferior officers, *see Braidwood*, 606 U.S. at 780-81.  Thus, the Secretary promulgated regulations to create the Judicial Officer's position,

7 C.F.R. § 2.35, and appoints the Judicial Officer to serve in that role.  That is the same method by which many other adjudicators are appointed and their offices established, from the Social Security Administration's Appeals Council to the Board of Immigration Appeals.  Those appointments are constitutional, *see Rodriguez v. Social Sec. Admin.*, 118 F.4th 1302, 1311-13 (11th Cir. 2024); *Duenas v. Garland*, 78 F.4th 1069, 1072-73 (9th Cir. 2023), and the Judicial Officer's appointment is likewise constitutional.

## STANDARD OF REVIEW

The district court granted the Department's motion to dismiss or, in the alternative, for summary judgment.  This Court reviews dismissals and grants of summary judgment *de novo*.  *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Roe v. Marshall Univ. Bd. of Governors*, 145 F.4th 561, 566 (4th Cir. 2025).

## ARGUMENT

**I.  Congress Constitutionally Authorized The Secretary To Adjudicate Violations Of The Horse Protection Act**

**A.**  The Constitution vests Article III courts with the judicial power of the United States.  Throughout the Nation's history, it has been established that certain matters outside of the judicial power may be adjudicated by the Executive Branch.  The first Congresses, for instance, tasked the Secretary of War with adjudicating whether veterans of the Revolutionary War were

15

entitled to military pensions. *See* Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Res. L. Rev. 1083, 1089-90 (2015). Thus, "since the beginning of the Republic," executive officials have "conduct[ed] adjudications," which may take "'judicial' forms" but are ultimately "exercises of … the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013).

In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between "public rights" and "private rights." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). Private rights, "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," are generally reserved to Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quotation marks omitted). But for public rights, "the mode of determining matters … is completely within congressional control," such that Congress may decide the matter itself, "delegate that power to executive officers, or may commit it to judicial tribunals." *Crowell v. Benson*, 285 U.S. 22, 50 (1932) (quotation marks omitted).

The Supreme Court has not "definitively explained" the difference between public and private rights, but its "precedents have recognized that the [public-rights] doctrine covers matters 'which arise between the

Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Oil States*, 584 U.S. at 334 (quoting *Crowell,* 285 U.S. at 50). Thus, public rights include matters like taxation, immigration, public lands, public benefits, and patents. *SEC v. Jarkesy*, 603 U.S. 109, 128-31 (2024). These matters do not involve "common law claims," and so "no involvement by an Article III court in the initial adjudication is necessary"—the matters can be determined by executive adjudicators, such as the Tax Court, the Social Security Administration, or an immigration judge. *Id.* at 128.

Under that framework, actions that are "quintessentially suits at common law" remain private rights that must be adjudicated in Article III courts. *Jarkesy*, 603 U.S. at 133 (quotation marks omitted). When Congress "create[s] claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts," that "target the same basic conduct as common law fraud, employ the same terms of art, ... operate pursuant to similar legal principles," and that impose "a punitive remedy," those matters remain private rights. *Id.* at 134-36. Thus, actions to impose civil penalties under the federal securities

laws, which Congress modeled directly on common law fraud, must be adjudicated in an Article III court with a jury. *Id.*

By contrast, if Congress creates "a new cause of action, and remedies therefor, unknown to the common law," that matter does not concern private rights "tried by the courts at Westminster." *Jarkesy*, 603 U.S. at 128, 137 (quotation marks omitted). For such public rights, the Constitution does "not require judicial determination," and so Congress may choose whether to decide the matter itself, "delegate that power to executive officers, or may commit it to judicial tribunals." *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929).

**B.** The Horse Protection Act does not resemble any pre-existing actions at common law; rather, it seeks to eliminate an evil that the common law did not address. In 1970, Congress explained that "about 20 years ago," horse owners discovered that the "proud, high skipping gait" of the Tennessee Walking Horse "could also be created artificially" by soring. H.R. Rep. No. 91-1597, at 2 (1970). By blistering the horse's leg with chemicals, and then wrapping the affected area with "chains or metal rollers," or using physical means such as "nails, tacks or even injections" on the horse's leg, the horse will suffer with every step it takes and lift its legs "up quickly and thrust them forward," thus "reproducing … the desired

gait." *Id.* Manis cites nothing in the common law that would prohibit this undoubtedly "cruel and inhuman" practice, 15 U.S.C. § 1822(1).

Congress understood that there was a tangible motivation behind harming these horses—there are Tennessee Walking Horse competitions, and owners and exhibitors have an incentive to win "cheaply" and without "patient, careful training." H.R. Rep. No. 91-1597, at 2. Further, soring causes multiple negative consequences: the individual horse is "cruelly mistreated," owners who refused to sore "must forgo most opportunities to compete … or they must devote their attentions to a different breed of horse," and widespread soring may "weaken, over a period of time, the breed's natural ability to 'walk' in its distinctive fashion." *Id.* at 2-3. Thus, the Horse Protection Act sought to "make it impossible for persons to show sored horses in nearly all horse shows." *Id.* at 3.

"In both concept and execution," the Horse Protection Act is "self-consciously novel." *Jarkesy*, 603 U.S. at 137. The Act's prohibitions on showing or exhibiting sore horses do not "employ the same terms of art" as any common law claim for fraud or breach of contract and do not "operate pursuant to similar legal principles" of such claims. *Id.* at 134. Instead, as the district court rightly recognized, the statute's central concern—

addressing the "abuse of horses"—was "foreign to the common law ethos." JA294.

In the common law tradition, domestic animals, such as horses, were the "absolute" property of man. 2 William Blackstone, Commentaries on the Laws of England *389-90 (1766). Accordingly, "at common law, cruelty to an animal merely upon the ground that it gave pain to the animal and for the protection or for the sake of the animal was not indictable." *People v. Brunell*, 48 How. Pr. 435, 43 (N.Y. Gen. Sess. 1874).[2] Indeed, early state statutes to address the abusive treatment of animals were promulgated precisely because there was no equivalent "common law offense." *Id*.; *see also Grise v. State*, 37 Ark. 456, 458 (1881) (explaining that contemporary state laws were "of comparatively recent origin" and reflected an "attempt to transcend what had been thought, at common law, the practical limits of

---

[2] *See also State v. Bruner*, 12 N.E. 103, 104 (Ind. 1887) ("There is a well-defined difference between the offense of malicious or mischievous injury to property, and that of cruelty to animals. The former constituted an indictable offense at common law, while the latter did not."); *State v. Beekman*, 27 N.J.L. 124, 127 (Sup. Ct. 1858) ("[A]mong the very numerous cases in the English books of indictments for maiming, wounding, and killing cattle, not a single conviction or precedent of an indictment can be found for the offence at common law, independent of the statute."); *see also id*. at 127-28 ("It is hardly conceivable that an offence at the common law so common as the killing, wounding, and maiming, and so serious as even to demand a multitude of statutes for its suppression, should not have been so much as mentioned by Coke, or Hale, or Hawkins.").

municipal government"). Thus, "because traditional rights and remedies were inadequate to cope with a manifest public problem," Congress created in the Horse Protection Act "a new cause of action, and remedies therefor, unknown to the common law." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60 (1989) (quotation marks omitted).

The Horse Protection Act does not seek to "regulate transactions between private individuals," *Jarkesy*, 603 U.S. at 135, or to determine "the liability of one individual to another" in a manner that would implicate private rights, *Crowell*, 285 U.S. at 51. Liability under the Act does not turn on whether a sored horse wins a competition or comes in last; whether any competition judges are deceived into thinking that a sored horse was well trained; or whether a particular competition requires participants to attest that their horses are not sored. In enforcing the Act, the Secretary does not step into the shoes of a competitor or a competition organizer—she instead seeks to enforce the statutory prohibitions that Congress enacted to stop this particular form of cruelty.

That conclusion is consistent with *Jarkesy*'s discussion of an earlier Supreme Court decision, *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977). There, two employers argued that Congress could not constitutionally direct the Executive Branch

to adjudicate workplace safety violations governed by the Occupational Safety and Health Act of 1970. *Id.* at 445-46. The Court rejected the employers' claim that they were entitled to a jury trial in federal court, explaining that "Congress has often created new statutory obligations, provided for civil penalties for their violation, and committed exclusively to an administrative agency the function of deciding whether a violation has in fact occurred." *Id.* at 450. Thus, as *Jarkesy* reiterated, Congress could assign those adjudications to the Executive Branch when they concerned "claims [that] were 'unknown to the common law.'" 603 U.S. at 138 (quoting *Atlas Roofing*, 430 U.S. at 461). And tellingly, the court of appeals in *Atlas Roofing* cited the Horse Protection Act as an example of an analogous enforcement scheme covered by its constitutional analysis. *See Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 518 F.2d 990, 1004 n.43 (5th Cir. 1975) (citing 15 U.S.C. § 1825(a) (1970)).

The Third Circuit recently adopted a materially similar analysis in upholding the constitutionality of the Hazardous Materials Transportation Act, which prohibits the transportation of dangerous packages, containers, railcars, and other items unless they satisfy stringent safety standards. *Axalta Coating Sys. LLC v. FAA*, 144 F.4th 467, 475-77 (3d Cir. 2025). The court of appeals held that these regulatory standards do not "bring …

common law soil with them" and are "unknown to the common law." *Id.* at 476-77 (alteration in original) (quotation marks omitted). Accordingly, an adjudicator can "determine, without any resort to common law concepts, that a person who offers a package for shipment by air that cannot" meet the specified safety standards "has 'violated'" the Hazardous Materials Act and its regulations. *Id.* at 477 (citation omitted). Even without considering the United States' fundamentally sovereign interests in regulating the channels and instrumentalities of interstate commerce, the Third Circuit held that the statutory scheme concerned "a public right that Congress may assign to the executive branch for adjudication." *Id.* That same analysis applies here.

**C.** Manis resists this conclusion and proffers several responses, none of which are availing.

Manis argues at length that the enforcement action violates the Seventh Amendment's right to a jury trial because a claim for "money penalties" is "legal in nature." Opening Br. 18. But by its own terms, the Seventh Amendment preserves the right of trial by jury for "Suits at common law" only "where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. As Manis acknowledges, Opening Br. 15,

the ALJ in the enforcement action imposed a monetary penalty of $10, JA218, so the Seventh Amendment has no application here.[3]

In all events, whether the challenged penalty "implicates the Seventh Amendment," *Jarkesy*, 603 U.S. at 125, is the beginning of the analysis, not the end. As explained, violations of public rights may be adjudicated by the Executive "free from the strictures of the Seventh Amendment." *Granfinanciera*, 492 U.S. at 51. That is true even where Congress authorizes the imposition of remedies in an administrative proceeding, including civil monetary penalties, that would require consideration by a jury were the matter heard in Court. *See, e.g.*, *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339-40 (1909) (upholding a civil penalty imposed by the Secretary of Commerce for a violation of certain immigration statutes); *see also Axalta*, 144 F.4th at 475 (holding that because the money penalty "implicates the Seventh Amendment" the court proceeded "to the second part of the *Jarkesy* analysis: whether the public rights doctrine" applies (quotation marks omitted)). The relevant inquiry,

---

[3] It makes no difference, as Manis suggests, Opening Br. 15 n.2, that the Secretary or a future Judicial Officer retains authority to modify the penalty. Unless and until that happens—and Manis offers no reason to conclude that it will—no Seventh Amendment violation has occurred, so Manis's claim fails as a matter of law.

then, is whether Congress can direct the Secretary to adjudicate violations of the Horse Protection Act. As explained above, Congress may do so.

Manis wrongly asserts that the Horse Protection Act necessarily falls outside the public-rights doctrine because, on Manis's account, the Supreme Court in *Jarkesy* "recognized" "[o]nly six categories of public rights." Opening Br. 26. That is not what *Jarkesy* said. The Court there listed areas that it had previously recognized as matters of public rights, while cautioning against expanding the public-rights category too broadly. *Jarkesy*, 603 U.S. at 128-30. But the Court disclaimed any intention to "definitively explai[n] the distinction between public and private rights," noting that "[t]his is an area of frequently arcane distinctions." *Id.* at 130-31 (quotation marks omitted). Moreover, under Manis's understanding of the public-rights doctrine, matters that plainly lack a common law analogue and implicate core public interests, such as matters of national security and the unlicensed export of goods to the militaries of adversary nations, would be "private rights" simply because they were not explicitly listed in *Jarkesy*. Such a cramped understanding of the public-rights doctrine is fundamentally flawed. Unsurprisingly, Congress has understood matters like export controls and national security to concern public rights, and it

25

has authorized the Executive Branch to adjudicate violations and impose penalties in that context where appropriate. *See, e.g.*, 50 U.S.C. § 4819(c).

Manis also errs in arguing that the enforcement action concerns private rights because it is analogous to common law claims for fraud, breach of contract, and tortious interference. Opening Br. 22-25, 32-35. As explained, there was no "common law offense" equivalent to the prohibition on cruel and inhumane treatment of horses contained in the Horse Protection Act. *Brunell*, 48 How. Pr. at 43 . Even though the district court made this exact point in concluding that the Act concerns public rights, JA294, Manis points to no historical example in which the common law concerned itself with the kind of conduct that the Horse Protection Act prohibits and that is the subject of the enforcement action. Indeed, Manis seemingly concedes that statutory claims, like this one, concerning "animal cruelty" are "non-legal." Opening Br. 31-32. It would do a court no good to look to the common law in evaluating whether a statutory violation occurred because the Horse Protection Act does not "operate pursuant to similar legal principles." *Jarkesy*, 603 U.S. at 134.

Manis's analogies to the common law also fail on their own terms. Manis principally likens the enforcement action to claims for "common law fraud" and "fraudulent conveyance." Opening Br. 22. But as Manis's own

preferred sources show, the Horse Protection Act in no way resembles those causes of action. A "traditional" common law fraud claim requires, among things, a "knowingly" "false representation" made "with intent to mislead" that induced actual "reliance" and resulted in "damage to the party misled." *Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994). Not one of those elements is necessary to establish a violation of the Horse Protection Act. Nor is there anything in the Act akin to a claim for fraudulent conveyance, which typically arises in the context of bankruptcy and involves the transfer of assets to "impair[] a creditor's ability to collect [a] debt." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). Relying on the Act's findings of fact, Manis argues that the statute is focused on "[h]orses that compete unfairly" and "harm the other competitors and the competition itself." Opening Br. 23 (citing 15 U.S.C. § 1822(2)). But to establish liability under the Act, there is no requirement that any harm to competition occur or that a horse be shown in a manner that is unfair (or fraudulent or false or misleading or any other such variant). *See* 15 U.S.C. § 1824 (setting out unlawful acts). Instead, as Manis himself puts it, "Congress simply prohibited the entry of horses that are sore into horse shows." Opening Br. 31.

27

For comparison, the Supreme Court in *Jarkesy* examined federal securities laws in which "Congress deliberately used 'fraud' and other common law terms of art," thereby "incorporat[ing] prohibitions from common law." 603 U.S. at 125. The Executive Branch had "followed suit in rulemakings," promulgating rules prohibiting various forms of fraudulent conduct. *Id.* And courts consistently "consider[ed] common law fraud principles when interpreting federal securities law." *Id.* at 125-26. Accordingly, there was an "enduring link between federal securities fraud and its common law ancestor." *Id.* at 125 (quotation marks omitted). The Horse Protection Act has no such link with any common law fraud claims. As Manis admits, Opening Br. 32, Congress did not incorporate fraud principles or borrow terms from the common law when enacting the Horse Protection Act. Nor do the Secretary's regulations prohibit fraud or fraudulent conduct. *See* 9 C.F.R. pt. 11. And Manis has cited no court decision interpreting the Act by reference to common law principles, which is hardly surprising given the lack of an equivalent common law offense.

Manis's cursory analogies to claims for breach of contract and tortious interference are even more strained. Opening Br. 24-25. Manis does not face liability because he failed to "abide by the horse show's rules" or "disrupted competitors' reasonable economic expectancies." Opening

Br. 24. Rather, the question is whether Manis violated the statute by entering a horse into a show when it "was sore within the meaning of the [Act]." JA208. The specific show's rules or the effect on other competitors is immaterial.

**D.** In *Jarkesy*, the Securities and Exchange Commission had free rein to bring the same fraud suit in district court or in an administrative proceeding. 603 U.S. at 116-17. That option is not available here. Congress has authorized the United States to bring collection actions from a final order of the Secretary, 15 U.S.C. § 1825(b)(3), but such a suit does not permit re-litigation of the civil penalty. Nor is there any freestanding cause of action for the Secretary to sue in district court to seek the disqualification of someone who has violated the Act. *Cf. id.* § 1825(c) (authorizing enforcement action before the Secretary). The absence of any other mechanism for enforcement—short of criminal prosecution—underscores the breadth of Manis's mistaken constitutional theory.

## II. The Judicial Officer Is An Inferior Officer Constitutionally Appointed By The Secretary

The Constitution's Appointments Clause, U.S. Const. art. II, § 2, cl. 2, prescribes the method for appointing officers of the United States—*i.e.*, those individuals who hold positions established by law and exercise "significant authority pursuant to the laws of the United States," *Lucia v.*

*SEC*, 585 U.S. 237, 245-46 (2018) (quotation marks omitted). The Constitution provides for two grades of officers: principal officers and inferior officers. Principal executive officers, like the Secretary, answer to the President directly and must be appointed by the President and confirmed by the Senate. *Id.* Inferior officers, by contrast, have a superior officer who directs and supervises their work. *Edmond v. United Sates*, 520 U.S. 651, 662-63 (1997). And as a matter of "administrative convenience," the Constitution permits these inferior officers to be appointed by the President alone, by the Courts of Law, or by the "the Heads of Departments," such as the Secretary. *Id.* at 660-61 (quotation marks omitted). Here, the Department's Judicial Officer is an inferior officer properly appointed by the Secretary.

**A.    The Judicial Officer Is an Inferior Officer Subject to At-Will Removal and Supervision by the Secretary**

**1.** While the Supreme Court has "not set forth an exclusive criterion for distinguishing between principal and inferior officers," *Edmond*, 520 U.S. at 661, "[i]nferior officers are most readily defined by their relationship to principal officers," *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). "[W]hether one is an inferior officer depends on whether he has a superior other than the President, and how much power the officer exercises free from control by a superior." *Id.* (citation and quotation

marks omitted). Thus, the "governing principle" is that "[i]nferior officers are those 'whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Id.* (quoting *Edmond*, 520 U.S. at 663). The Supreme Court has consistently held that an officer is sufficiently supervised and directed to qualify as an "inferior officer" when (a) the officer can be removed by the Department Head at will; or (b) an adjudicative officer lacks free-standing authority to make a final decision; or (c) a combination of the two.

The removal power has long been recognized as a "powerful tool for control," *Braidwood*, 606 U.S. at 762 (quoting *Edmond*, 520 U.S. at 664), because after "an officer is appointed, it is only the authority that can remove him … that he must fear and, in the performance of his functions, obey," *id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)). The power of at-will removal "generally creates a here-and-now subservience," *id.* (quotation marks omitted), and "[h]istorical practice supports treating an officer who is removable at will by a principal officer as an inferior officer," *id.* at 762-63 (collecting examples from the Founding). Indeed, the Supreme Court recently recognized that it was not aware of "any instance where an executive officer [who] was removable at will by someone other

than the President" had "nonetheless [been] deemed a principal officer." *Id.* at 763.

Additionally, adjudicative officers have consistently been understood to be constitutionally inferior when they require another officer's permission to enter a final decision. Thus, the special trial judges of the Tax Court are inferior officers because they can only make decisions "subject to such conditions and review as the" Tax Court's principal officers may provide. *United States v. Arthrex*, 594 U.S. 1, 20 (2021) (quotation marks omitted). Likewise, the Board of Veterans' Appeals makes final decisions on benefits claims "within the Department of Veterans Affairs," but those decisions are "reviewed by the Court of Appeals for Veterans Claims, [another] Executive Branch entity." *Id.* The Supreme Court likewise identified the Board of Immigration Appeals—which makes final decisions in nearly all removal cases on behalf of the Attorney General—as "involv[ing] inferior officers whose decisions a superior executive officer can review or implement a system for reviewing." *Id.*

Here, there is no statutory restriction on the Secretary's authority to remove the Judicial Officer, and so "there can be no doubt that the Secretary may remove [the Judicial Officer] at will." *Braidwood*, 606 U.S. at 764 (quotation marks omitted). The Judicial Officer's ability to issue

decisions at all, moreover, comes solely from the Secretary's delegated authority, and the Secretary retains complete authority to review cases herself in the first instance or to "implement a system for reviewing" the Judicial Officer's decisions. *Arthrex*, 594 U.S. at 20; *accord Rodriguez v. Social Sec. Admin.*, 118 F.4th 1302, 1311-13 (11th Cir. 2024) (holding adjudicators to be inferior officers in similar circumstances); *In re Palo Alto Networks, Inc.*, 44 F.4th 1369, 1375-76 (Fed. Cir. 2022) (same).

**2.** The Supreme Court in *Edmond* extensively discussed the various ways in which an adjudicator may be "directed and supervised at some level" by superior officers. 520 U.S. at 663. *Edmond* held that military appellate judges were inferior officers because other officers had the power to direct and review the judges' work, and to remove the judges from their assignments. *Id.* at 664-65. The judges were supervised by the Judge Advocate General, an officer who "exercise[d] administrative oversight" and could "prescribe uniform rules of procedure" and "formulate policies" that the judges must follow. *Id.* at 664 (quotation marks omitted). The Judge Advocate General could also "remove a ... judge from his judicial assignment without cause." *Id.* Additionally, "another Executive Branch entity," the Court of Appeals for the Armed Forces, had authority to review some (but not all) aspects of some (but not all) of the judges' decisions. *Id.*;

*see also* 10 U.S.C. § 867(a), (c) (detailing limits on review).  Thus, while no executive officer had "complete" control over the military judges and their decisions, the judges were inferior officers because they could not "render a final decision on behalf of the United States unless permitted to do so by other Executive officers."  *Edmond*, 520 U.S. at 66  -65.

Applying *Edmond*, the Supreme Court in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, held that members of an oversight board were inferior officers because the Securities and Exchange Commission could remove them at will and could review many of their decisions.  561 U.S. 477, 510-11 (2010).  Although the board members were initially shielded from at-will removal by a statute, the Court held that the removal restriction was unconstitutional and severed it.  *Id.* at 508-10.  Once subject to at-will removal and "the Commission's other oversight authority," *id.* at 510, the board members were properly understood as inferior officers, even though the board was still "empowered to take significant enforcement actions ... largely independently of the Commission," *id.* at 504.

Most recently in *Braidwood*, the Supreme Court held that members of the U.S. Preventive Services Task Force were inferior officers given that the Secretary of Health and Human Service could "remove Task Force

members at will" and could "review and block the Task Force's recommendations before they can take effect." 606 U.S. at 762. The Court reiterated that someone "who is removable at will by a principal officer … typically qualifies as an inferior officer." *Id.* And the Court recognized that "[a] collection of statutes grant[ed] the Secretary general supervisory authority over the Task Force," including the authority to promulgate regulations "providing that no Task Force recommendation shall be deemed 'in effect' until he or his designee has affirmatively reviewed and approved it." *Id.* at 766-77. This latent authority allowed the "Secretary to review and, if he chooses, directly block a [decision] he disagrees with." *Id.* at 766. The Court made clear that "for purposes of the Appointments Clause, the Secretary need not review every decision" by an inferior officer, because what matters "is that the Secretary have the *discretion* to review" such decisions. *Id.* at 767 (quotation marks omitted).

By contrast, when a principal officer lacks statutory authority to review an adjudicative officer's decisions, and lacks authority to remove the officer at will, those combined restrictions can create a constitutional problem. The Supreme Court in *Arthrex* considered administrative patent judges, who were appointed by a Department Head, 594 U.S. at 6, had statutory removal restrictions, *id.* at 17 (citing 5 U.S.C. § 7513(a)), and

35

could issue decisions that were, by statute, "the last stop for review within the Executive Branch," *id.* at 9 (citing 35 U.S.C. § 6(c)). The Supreme Court held that this was incompatible with the patent judges' status as inferior officers because the statutory scheme "insulat[ed] their decisions from review and their offices from removal." *Id.* at 23. To remedy these constitutional defects, the Federal Circuit had severed the judges' statutory removal restrictions. *Id.* at 25-26. The Supreme Court cast no doubt on the effectiveness of that response, but it chose instead to sever the statutory restrictions on reviewability, which granted the Director of the Patent and Trademark Office the choice to review the patent judges' decisions before they became final. *Id.*

**3.** Applying *Arthrex*, the courts of appeals have confirmed that what matters for purposes of the Appointments Clause is that a principal officer must have statutory authority to review a subordinate's decision. But whatever regulations the principal officer chooses to promulgate to guide that review are entirely up to the principal officer and do not change the Appointments Clause analysis.

Thus, the Federal Circuit after *Arthrex* considered the same statutory scheme involving patent judges, where the Director of the Patent and Trademark Office now had statutory authority to review the patent judges'

decisions.  *Palo Alto Networks*, 44 F.4th 1369 at 1371-72.  The Director, however, had promulgated guidance to make clear that the Director was choosing categorically to not review certain decisions issued by the patent judges.  *Id.* at 1373-74.  The court of appeals rejected an Appointments Clause challenge to the Director's choice, explaining that after *Arthrex* "there is no structural impediment to the Director's authority to review" the judges' decisions, because—by statute—the decisions are "the Director's to make and are only made by the [patent judges] as a matter of delegated authority."  *Id.* at 1375.  The court explained that the Appointments Clause is designed to preserve and clearly define political accountability, and there were "clear lines of accountability" from "the President to the Director" because the Director was "the politically accountable executive officer responsible for" the relevant decisions.  *Id.* (quotation marks omitted).

Likewise, the Eleventh Circuit has held that the members of the Appeals Council at the Social Security Administration properly served as inferior officers.  *Rodriguez*, 118 F.4th at 1311-13.  The plaintiff in *Rodriguez* resisted that conclusion, pointing to a regulation providing that Appeals Council decisions are "binding and not subject to further review." *Id.* at 1312 (quoting 20 C.F.R. § 404.972).  The court of appeals rejected that argument, explaining that the Commissioner of Social Security had

statutory authority to make all decisions in claims for Social Security benefits and had, as a matter of discretion, chosen to delegate that authority to the Appeals Council. *Id.* at 1312-13. The Commissioner's choice to "delegat[e] administrative authority" to an inferior officer "is not the same as [a] statutory restriction" on reviewing an inferior officer's decision. *Id.* at 1313. Instead, the Commissioner "is still ultimately responsible for the exercise of all powers and the discharge of all duties of the" agency, and the Appeals Council members are "subject to the Commissioner's authority and control." *Id.* at 1312-13 (quotation marks omitted). Any "regulatory restriction on further agency review, derived from the Commissioner's own authority[,] … does not convert the Appeals Council members into principal officers." *Id.* at 1313.

**4.** All of these decisions confirm the straightforward conclusion that the Secretary constitutionally supervises and directs the Judicial Officer.

The Secretary can remove the Judicial Officer at will, and Manis has not cited any instance in which an officer removable at will by a principal officer was nonetheless held to be a principal officer. *See Braidwood*, 606 U.S. at 765. Indeed, in like circumstances, the D.C. Circuit has held that executive adjudicators are properly considered inferior officers where the Department Head can remove them at will, even though the adjudicators'

38

"decisions will still not be directly reversible." *Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1340-41 (D.C. Cir. 2012).

The Secretary also exercises "general supervisory authority" over the Judicial Officer.  The Judicial Officer lacks any statutory basis for exercising any free-standing authority—all of the Judicial Officer's duties come from a voluntary delegation by the Secretary, 7 C.F.R. § 2.35(a), which the Secretary can revoke "at any time," 7 U.S.C. § 2204-2.  Even absent a complete revocation of the Judicial Officer's authority, the Secretary can simply "step in and act as final appeals officer in any case." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1103 (D.C. Cir. 2021); *accord* 7 C.F.R. §§ 1.132, 2.12.[4]  Indeed, the Secretary does not need to assign any matters to the Judicial Officer or an administrative law judge at all—the statute assigns adjudication to the Secretary in the first instance.  15 U.S.C. § 1825(b).  There is thus "no structural impediment to the" Secretary's supervisory authority.  *Palo Alto Networks*, 44 F.4th at 1375; *accord Rodriguez*, 118 F.4th at 1313.

---

[4]  The Secretary has exercised that authority to "assume direct authority for all further rulings and orders" in a case and to vacate prior orders issued by the Judicial Officer.  *See In re Apex Meat Co.*, 47 Agric. Dec. 557, 1988 WL 242869, at *1 (U.S.D.A. Mar. 4, 1988).

The Secretary has other mechanisms of control too. The Judicial

Officer must obey the Secretary's procedural regulations, *see* 60 Fed. Reg.

8,446 (Feb. 14, 1995), and her substantive regulations implementing the

Horse Protection Act, *see* 15 U.S.C. § 1828; 9 C.F.R. §§ 11.1-11.41. Thus, the

Secretary has instructed generally that the Judicial Officer must bring to

her attention any "application of new principles of major importance" or

any "departure from principles established by the Secretary." 7 C.F.R.

§ 2.11. And the "Secretary can use [her] rulemaking authority" to "provid[e]

that no" decision of the Judicial Order shall be final until the Secretary "has

affirmatively reviewed and approved it." *Braidwood*, 606 U.S. at 767.

**5.** Manis nonetheless argues that the Judicial Officer must be a

principal officer because, according to Manis, "the Secretary is barred" from

reviewing a Judicial Officer's "final adjudicative decisions in [Horse

Protection Act] cases." Opening Br. 41. The argument is flawed in several

respects.

First, the argument is premature here because there has been no

"final adjudicative decision[]" issued by the Judicial Officer in the at-issue

administrative proceeding. While the ALJ has issued an initial decision,

JA208, Manis's appeal has been stayed pending this litigation, JA221. At

this time of this filing, moreover, the role of Judicial Officer is vacant. *See*

*supra* p. 5.  Accordingly, the Secretary could still choose to decide Manis's appeal herself simply by exercising the previously delegated adjudicative authority.  The Secretary's authority to resolve Manis's appeal underscores that the Judicial Officer is an inferior officer subject to the Secretary's "general supervisory authority."  *Braidwood*, 606 U.S. at 766.

Manis questions the Secretary's authority to decide the matter, Opening Br. 41-43, but offers no persuasive reason for why the statutory and regulatory scheme would preclude that outcome.  Manis stresses that § 2204-3 prohibits a retroactive revocation of the Secretary's delegated authority.  Opening Br. 41.  But as this case illustrates, the Secretary could decide the administrative appeal directly without revoking any prior delegation.  In any event, there would be nothing retroactive about revoking the Judicial Officer's authority where, as here, the Judicial Officer had not taken any action in the appeal other than staying it pending this litigation.  Manis also asserts that any revocation "after a complaint is filed" would be "unlawfully retroactive" because the Secretary must follow "established rules."  Opening Br. 41-42.  That is a non-sequitur:  The statutory scheme allows the Secretary to revoke "any part of a delegation" at "*any time*."  7 U.S.C. § 2204-2 (emphasis added).

Manis separately asserts that 7 U.S.C. § 2204-3 prohibits the Secretary from "retaining adjudication authority when she delegates it to the Judicial Officer." Opening Br. 43. Again, that argument is beside the point where, as here, there is no currently serving Judicial Officer to whom authority has been delegated. It is also wrong on its own terms. In relevant part, § 2204-3 provides that where a delegation is made, "all provisions of law" shall be construed as if the delegated function "had (to the extent of the delegation) been vested by law in the individual to whom the delegation is made, instead of in the Secretary." That provision merely clarifies the "[a]uthority of designated employees." 7 U.S.C. § 2204-3. It by no means establishes that the Secretary is precluded from exercising authority once delegated, particularly because the Secretary's implementing regulations make clear that "[n]o delegation of authority" precludes the Secretary "from exercising any of the authority so delegated," 7 C.F.R. § 2.12, and they define the Judicial Officer to include "the Secretary of Agriculture if the authority so delegated is exercised by the Secretary," *id.* § 1.132. Thus, as the D.C. Circuit has previously recognized, the Secretary may elect to "step in and act as final appeals officer in any case." *Fleming*, 987 F.3d at 1103 (citing 7 C.F.R. § 2.12). In all events, Congress did not prohibit the Secretary from supervising and reviewing the Judicial Officer's decisions.

42

The Secretary thus plainly has "*discretion* to review" the Judicial Officer's decisions, which is "[w]hat matters" "for purposes of the Appointments Clause." *Braidwood*, 606 U.S. at 767 (alteration in original) (quotation marks omitted); *accord Rodriguez*, 118 F.4th at 1311-13; *Palo Alto Networks*, 44 F.4th at 1375-76.

Manis further errs in contending that secretarial review would somehow offend the Fifth Amendment's Due Process Clause. Opening Br. 42, 44. Again, the argument is premature because there has been no final adjudication by the Judicial Officer here, so Manis's theory of a due process violation is based on powers that the Secretary has not exercised and possibly never will. More fundamentally, Manis offers no persuasive explanation for why review by the Secretary would raise due process concerns if the Secretary were, for instance, to exercise her discretionary authority to remit a civil penalty, 15 U.S.C. § 1825(b)(4), or to provide that no decision of the Judicial Officer shall be final until reviewed and approved by the Secretary, *see Braidwood*, 606 U.S. at 767. And the Secretary may of course adjudicate Manis's case personally in compliance with both due process and the Administrative Procedure Act, which permits the Secretary to both initiate an enforcement action and adjudicate the matter. *See* 5 U.S.C. § 554(d)(C); *Withrow v. Larkin*, 421 U.S. 35, 46-55

(1975) (holding that it comports with due process for an investigator to also serve as an adjudicator).

Manis mistakenly seeks to rely on *Utica Packing Co. v. Block*, which presented a procedural history completely unlike the matter here. 781 F.2d 71, 75 (6th Cir. 1986) ("Neither the court nor the parties have found a case with facts similar to those established by this record."). There, after the Judicial Officer issued a "final decision in a case," the Secretary revoked the Judicial Officer's delegation, assigned the matter to an official who "had never performed adjudicatory, regulatory or legal work," and "assigned a legal advisor to the new Judicial Officer who worked under an official who was directly involved in prosecution of the … case." *Id.* at 72, 74-75, 78. The Sixth Circuit recognized that the "requirement of separation of functions is relaxed in administrative adjudication," *id.* at 77, but it concluded that the unique factual scenario of the case created an impermissible appearance of bias and violated due process, *id.* at 77-78. Nothing in the opinion suggests that the Secretary lacked the authority to decide the case personally before there was a final decision, nor did the Sixth Circuit suggest that it would violate due process for the Secretary to promulgate a regulation subjecting the Judicial Officer's decisions to final review by the Secretary as a matter of course.

### B. The Secretary May Properly Appoint the Judicial Officer

Manis separately argues that the Judicial Officer cannot serve as an inferior officer because the office is created by regulation, rather than by statute. Opening Br. 48-52. That is, of course, a feature common to many inferior offices. The Social Security Appeals Council is "a creature of regulatory rather than statutory creation," *Rodriguez*, 118 F.4th at 1313 (quotation marks omitted), yet that only underscores the conclusion that its members are properly appointed inferior officers, *id.* The Board of Immigration Appeals likewise has "[n]o statute [that] specifically governs the appointment" of its members, and the Board's offices are instead created by regulation. *Duenas v. Garland*, 78 F.4th 1069, 1073 n.2 (9th Cir. 2023). But that poses no impediment to the Attorney General's appointment of Board members as inferior officers. *Id.* The same holds true for the Department of Labor's Administrative Review Board, *Willy v. Administrative Rev. Bd.*, 423 F.3d 483, 491 (5th Cir. 2005); *Varnadore v. Secretary of Lab.*, 141 F.3d 625, 631 (6th Cir. 1998), whose members are appointed by the Secretary of Labor to offices established by regulation.

These examples are consistent with the text and purpose of the Appointments Clause. The Clause provides that Congress "may by Law vest the Appointment of such inferior Officers" in Department Heads. U.S.

Const. art. II, § 2, cl. 2.  That reference to Congress contemplates that there must be a statute granting the Secretary appointment authority generally. The Appointments Clause separately provides an independent requirement that offices must be "established by Law," but does so without reference to Congress.  *Id.*  As this Court has explained, "the plain meaning of 'law' includes regulations having the force and effect of law."  *United States v. Mitchell*, 39 F.3d 465, 468 (4th Cir. 1994).  Thus, Congress can generally grant a Secretary authority to appoint inferior officers as may be needed throughout the Department, and the Secretary can promulgate regulations creating offices where necessary.  If Congress wishes to curtail the Secretary's authority to appoint or create offices, it may do so—but the Appointments Clause's provision for inferior offices is meant to provide "administrative convenience," *Edmond*, 520 U.S. at 660, and nothing in the text mandates that Congress uniquely identify each office by statute.

Here, Congress granted the Secretary authority "to designate officers or employees of the Department to whom functions may be delegated … and to assign appropriate titles to such officers or employees."  7 U.S.C. § 2204-2.  That statutory authority permits the Secretary to generally appoint officers as needed throughout the Department, and specifically to

promulgate regulations establishing the Judicial Officer's role and to appoint a person to that position.  *See* 7 C.F.R. § 2.35.

Manis resists that conclusion, insisting that an office must be "created by statute, down to its duties, salary, and means of appointment."  Opening Br. 48-49 (quoting *Lucia*, 585 U.S. at 248; and then citing *Burnap v. United States*, 252 U.S. 512, 516-17 (1920)).  As the district court rightly recognized, JA267-69, Manis is misreading the cases he relies upon.  *Lucia* held that ALJs were inferior officers who held an office "established by law," because the office was established both by statute and by regulation. 585 U.S. at 247-48 (citing 5 U.S.C. § 3105; 5 C.F.R. § 930.204(a)). Likewise, *Burnap* did not address the constitutional requirements for creating an office—it concerned a plaintiff who argued that he was improperly fired from his position as a landscape architect because (on his theory) he should have been fired by the Secretary of War.  285 U.S. at 514. The Court held that the Chief of Engineers properly fired the plaintiff because Congress had by statute provided that the Chief of Engineers could hire and fire employees like the plaintiff.  *Id.* at 518-19.  Nothing in *Burnap* advances Manis's arguments here.

Manis is also wrong that the term "designate" cannot grant the Secretary appointment power.  Opening Br. 51.  The Supreme Court

47

rejected that same argument in *Braidwood*, holding that "Congress need not use magic words to confer appointment authority," and that in any event "the verb 'appoint'" has long been "synonymous with 'allot, assign, or designate.'"  606 U.S. at 780 (quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 312-13 (2017) (Thomas, J., concurring)).  Manis insists that "the word 'designate' must still be read in its context," Opening Br. 51, but context further supports the Secretary's longstanding appointment authority.  Congress first authorized the Secretary to delegate authority "to any officer or employee designated under this [statute]" in 1940.  *See* Act of Apr. 4, 1940, ch. 75, § 2, 54 Stat. 81, 81 (codified at 7 U.S.C. §§ 2204-2, 2204-3).  The Secretary has since exercised that authority on multiple occasions, including to appoint several Judicial Officers.  Never during that nearly 75-year history has Congress acted to strip the Secretary of her appointment authority or to otherwise modify her appointment practices; instead, Congress has clarified that the Secretary's authority to delegate "includes the authority to establish, consolidate, alter, or discontinue any agency, office, or other administrative unit of the Department."  7 U.S.C. § 6912(a)(1).

# CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed. If the Court were to reverse, the Court should follow its usual course and remand to the district court for further proceedings, not—as Manis urges, Opening Br. 52-54—weigh the equitable factors and enter a permanent injunction in the first instance. *See Biggs v. North Carolina Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020) ("[W]e are a court of review, not first view.").

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
DANIEL AGUILAR
 *s/ David L. Peters*
DAVID L. PETERS
  *Attorney, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-6735*
  *david.l.peters@usdoj.gov*

January 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,418 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*s/ David L. Peters*
David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*s/ David L. Peters*
David L. Peters